PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCIT
_____

Nos. 14-4174 & 14-4277
_____

AVAYA INC., RP
Appellant in 14-4174

v.

TELECOM LABS, INC.; TEAMTLI.COM CORP.,
CONTINUANT, INC., SCOTT GRAHAM;
DOUGLAS GRAHAM; BRUCE SHELBY

Telecom Labs Inc., Continuant Inc.,
Appellants in 14-4277
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civ. Action No. 1:06-cv-02490)
District Judge:  Hon. Joseph E. Irenas
_____

Argued
January 19, 2016

Before:   JORDAN, HARDIMAN, and GREENAWAY, JR.,
*Circuit Judges*.

(Filed: September 30, 2016)
_____

Seth P. Waxman   [ARGUED]
Leon B. Greenfield
Danielle M. Spinelli
Catherine M.A. Carroll
David L. Sluis
Jonathan A. Bressler
Thomas G. Sprankling
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue, NW
Washington, DC   20006

Robert T. Egan
Mark J. Oberstaedt
Archer & Greiner P.C.
One Centennial Square
33 E. Euclid Avenue
Haddonfield, NJ   08033

Jacob A. Kramer
Bryan Cave LLP
1155 F Street, NW
Washington, DC   20004

Lawrence G. Scarborough
Bryan Cave LLP
Two North Central Avenue – Ste. 2200
Phoenix, AZ  85004
		*Counsel for Appellant/Cross-Appellee*

Douglas F. Broder
K&L Gates LLP
599 Lexington Avenue
New York, NY   10022

Raymond A. Cardozo
Paul D. Fogel
Reed Smith LLP
101 Second Street – Ste. 1800
San Francisco, CA   94105

Kathy D. Helmer
Scott G. Kobil
Anthony P. LaRocco
John Marmora
Charles F. Rysavy
K&L Gates LLP
One Newark Center – 10th Fl.
Newark, NJ   07102

Richard L. Heppner, Jr.
James C. Martin   [ARGUED]
Colin E. Wrabley
Reed Smith LLP
225 Fifth Avenue – Ste. 1200
Pittsburgh, PA   15222
          *Counsel for Appellees/Cross-Appellants*

_____

OPINION OF THE COURT
_____

3

**Table of Contents**

I.   Introduction .........................................................6

II.  Background ........................................................8

   A.    Factual Background ....................................8

      1.    PBX Systems and Maintenance ............9

      2.    PDS Systems and Maintenance...........14

      3.    The Dispute between Avaya and TLI ..................15

   B.    Procedural Background ...........................19

III.  Avaya's Appeals.............................................24

   A.    Judgment as a Matter of Law on Avaya's Common Law Claims ..............................24

      1.    Evidence Supporting Avaya's Common Law Claims...........................................26

      2.    Customer Contract Interpretation.........36

      3.    Tortious Interference with Prospective Business Advantage ............................44

      4.    Unfair Competition...............................54

      5.    Fraud.....................................................57

      6.    Breach of Contract...............................61

      7.    Conclusion............................................67

   B.    Prejudice on the Antitrust Verdict ..........68

      1.    General Prejudice to Avaya's Antitrust Defense .68

      2.    "Fear, Uncertainty, and Doubt" Letters ..............74

      3.    Interference with Defense and Cross-

Examination...........................................................76

    4.    Harmless Error Analysis .....................................78

  C.    Antitrust Issues .......................................................80

    1.    Tying in Antitrust Law .......................................80

    2.    PBX Attempted Monopolization Claim...............96

    3.    PDS Tying Claim ...............................................102

IV.  TLI's Cross-Appeals ....................................................109

  A.    Summary Judgment on TLI's Common Law
        Claims ...................................................................109

  B.    Summary Judgment on PBX Upgrade Tying
        Claim.....................................................................113

  C.    *Noerr-Pennington* Ruling .....................................115

V.   Conclusion..................................................................118

JORDAN, *Circuit Judge*.

## I.    Introduction

When asked why he was so intent on scaling Mount Everest, the ill-fated mountaineer George Mallory famously replied: "because it's there."[1]  The parties before us have put a twist on that philosophy: they have created their own mountain of issues and have argued, appealed, and cross-appealed nearly all of them.[2]  Unfortunately, if there had been a hope of bringing this matter to conclusion any time soon, that was dashed when, in the middle of trial, the District Court erroneously granted judgment as a matter of law against one side, tainting the entire trial and the ultimate verdict.  We will therefore vacate the judgment of the District Court and remand with instructions for further proceedings.  We do not take this step lightly, but the error of the District Court here was of such magnitude that we seriously doubt the correctness of the ultimate verdict.

This case arises from the fractured relationship between a large communications equipment manufacturer,

---

[1] *Climbing Mount Everest Is Work for Supermen*, N.Y. Times, Mar. 18, 1923, at 11.

[2] The District Court recognized the battle-every-issue character of the litigation.  To one request from counsel to "make a record" of his objection, the Court responded: "Make a record, go ahead.  The circuit will love it.  It will be the 5,927th error you have pointed out to them."  (J.A. 2397.)

6

Avaya Inc. ("Avaya"), and one of its dealers and service providers, TLI.[3] After they fell out, Avaya aggressively acted to block TLI from providing independent maintenance services for Avaya equipment. Meanwhile, the now-independent TLI took a series of legally dubious actions to gain access to Avaya communications systems used by clients the parties once shared. Avaya filed suit, alleging several business torts and breach of contract; TLI counter-sued for antitrust violations. After years of pre-trial litigation, and in the midst of a months-long trial, the District Court granted TLI's motion under Federal Rule of Civil Procedure 50 for judgment as a matter of law against Avaya on all of Avaya's affirmative claims. The Court later instructed the jury that none of TLI's actions could be considered unlawful. With that instruction guiding it, the jury found Avaya liable for two antitrust violations and awarded substantial damages.

We conclude that the entry of judgment as a matter of law was erroneous. Given how intertwined the two sides' claims are – and given that Avaya's antitrust defense relied in large part on justifying Avaya's conduct as a response to TLI's conduct – we also conclude that the erroneous Rule 50

---

[3] We use "TLI" as shorthand for a group of small service providers that are under common ownership and control and are collectively the appellees/cross-appellants. They include Telecom Labs, Inc. ("TLI"), TeamTLI.com Corp., and Continuant, Inc., along with their common owners and managers Douglas Graham, Scott Graham, and Bruce Shelby. Although Continuant seemingly took over the businesses' continuing interests beginning in 2005, TLI was the firm most involved in this dispute from the beginning, so we use that name for simplicity.

judgment infected the jury's verdict. We must therefore vacate the judgment of the District Court. A tour of the mountain follows.

## II. Background

### A. Factual Background

Avaya, the appellant and cross-appellee, "designs, manufactures, sells, and maintains telecommunications equipment." (Opening Br. at 7.) Two of its products in particular are the subject of this suit. The first is its private branch exchange ("PBX"), which "is essentially a special-purpose computer ... that functions as a telephone switchboard" and is used by "[l]arge organizations needing an internal telephone network." (*Id.*) The second product is its predictive dialing system ("PDS"), which is an "automated telephone dialing system that uses a predictive algorithm to anticipate when the user ... will be able to reach someone, improving the chances a call will be answered." (*Id.* at 7-8.) The PBX technology was invented in the 1980s by AT&T Co., which in 1996 spun its PBX business off to Lucent Technologies, Inc., which in turn spun off Avaya in 2000.

TLI and three individuals who operated it are the appellees and cross-appellants. TLI sold post-warranty maintenance for Avaya PBXs and PDSs. At one point, TLI was also part of Avaya's Business Partner program, selling communications systems on Avaya's behalf. When Avaya began downsizing from 1999 to 2001, it encouraged its Business Partners to hire laid-off Avaya maintenance technicians, even subsidizing that process. TLI made several such hires and began to offer maintenance services in 2001.

Not long after, in 2003, TLI and Avaya acrimoniously severed their relationship,[4] but TLI continued to provide maintenance services on Avaya products as an independent service provider.

### 1.    PBX Systems and Maintenance

Of the two types of systems at issue in this litigation, the PBX has a substantially larger market. Avaya characterizes PBX systems as durable goods with extended longevity and high fixed costs. During much of the time relevant to this suit, PBX systems had a useful lifespan of about eight years, though some could remain in use for decades.[5] They have many capabilities but were sold in a

---

[4] The reasons for the divorce are, of course, like everything else in this case, hotly contested, and they are elaborated in more detail below. Here is a thumbnail sketch: Avaya contends that TLI violated its obligations as an Avaya agent, whereas TLI alleges that Avaya imposed onerous surprise conditions to prevent a partner firm like TLI from recouping the investments it had made at Avaya's request.

[5] Those statistics are based on PBXs sold before 2000. In the 2000s, traditional PBXs were replaced with systems that use internet protocol telephony. Whereas with older "refrigerator-box-type PBXs, it was ... easy to identify and define what a ... life of a system was," with the "IP PBXs ... any one server might come out of service, perhaps as quickly as after just a couple ... years." (J.A. 4382.) Given the constant replacement of equipment on those modern PBXs, it is "very difficult to measure" what the lifetime of a system is. (*Id*.)

default mode without most of them activated. Customers could then license individual capabilities, depending on their needs. As one Avaya systems engineer explained it at trial, Avaya "provide[s] software to our customers that's able to do a vast number of things, but customers don't want to pay for all the things the software can do. ... They may not need all the capabilities ... . So we allow customers to purchase the right to use aspects of the software ... ." (J.A. 1886.)

One of those "aspects" is a set of maintenance features[6] that was and is licensed separately from the PBX system itself. Those features are accessed via on-demand maintenance commands ("ODMCs"). Users of the maintenance features – whether Avaya technicians, non-Avaya technicians, or customers themselves – access the pertinent software using login credentials. Each login is matched to the ODMCs that that specific user is authorized to use. In addition to controlling those logins, Avaya has a second way to regulate access to the ODMCs. The ODMCs are only useable on a given PBX system if Avaya has activated the corresponding maintenance software permissions ("MSPs"). Avaya's PBX systems come with the MSPs disabled, but customers who execute a specific license agreement can have the MSPs, and hence the ODMCs,

---

[6] The use of the word "feature" to describe elements of the software that enabled remote maintenance is legally relevant to questions of contract interpretation in this case. *See infra* Part II.A.2. We use the word here as a generic term, without implying anything about how it should be read in the specific context of Avaya's contracts with its customers.

10

enabled. Later, when that license terminates, Avaya disables the MSPs.

Avaya and its authorized Business Partners offer maintenance service, which is a profitable line of business. Avaya contends that the "margin on the initial sale of a PBX is 'thin,'" whereas the rate of profit on maintenance work is much higher. (Opening Br. at 8.) It says that the profit the company earns from maintenance is an important source of funds for the improvement of PBX systems and the development of new models, which are released roughly every two years. According to Avaya, its major competitors in this market – Cisco, Siemens, and Microsoft – follow a similar business model of low-margin equipment and high-margin maintenance, and those firms compete with each other and with Avaya over the "total cost of ownership" of both equipment and maintenance. (Opening Br. at 9.)

During the time period covered by this litigation, Avaya offered three tiers of maintenance options for PBX customers. The highest-end, most expensive option was to buy maintenance from Avaya itself, whose technicians had full access to ODMCs and certain other Avaya software capabilities.

The second, intermediate, option was to purchase maintenance from an authorized Avaya Business Partner. Business Partners could access a customer's maintenance software through a login called "DADMIN," once Avaya activated it on a customer's PBX. As participants in Avaya's maintenance program, Business Partners had to complete special training and were given access to engineering support. They also had to agree not to solicit maintenance contracts

11

from existing Avaya maintenance customers. Avaya forthrightly admits that it thus imposed vertical restraints on maintenance through the Business Partner program to encourage the Business Partners to "expand sales of Avaya PBXs in the competitive primary market, rather than simply to cannibalize existing maintenance business." (Opening Br. at 13.)

Finally, Avaya offered a self-maintenance option to its customers. Prior to 2008, customers who undertook to maintain their own PBX systems would have to purchase a license to gain access to the necessary MSPs. In 2005, out of tens of thousands of Avaya PBX customers, about 270 of Avaya's largest customers used the self-maintenance option, which allowed their in-house technology departments to perform maintenance on their PBX systems. With its 2008 hardware release, Avaya began making MSPs part of the base package for all PBX purchasers, so that they no longer had to pay additional money for access to those maintenance features. They were, however, then subject to heightened contractual restrictions against using independent service providers ("ISPs").[7]

ISPs in fact became a fourth source of maintenance for Avaya PBX systems, and – from Avaya's perspective at least – a very unwelcome one. Avaya has made no secret of its

_____

[7] The Avaya expert who testified about the change in policy suggested that the reason for the change was that the features available for purchase on the PBXs had become so numerous that Avaya began including many of them by default.

12

hostility to ISPs, and it acknowledges that it "has never given third parties the logins necessary to access the ODMCs needed to maintain PBXs." (Opening Br. at 15.) As Avaya characterizes it, prior to 2003, there were no significant ISPs on the market, and they did not become noticeable market players until 2005. At that point, Avaya released an internal July 2005 bulletin affirming that "Avaya ... does not provide maintenance support for clients of or directly to unauthorized service providers" (J.A. 7043), and it recapitulated its policy that MSPs and self-maintenance licensing would not be available to customers who used ISPs. A 2006 federal court opinion rejected an antitrust suit challenging Avaya's policy against giving ISPs maintenance software access.[8]

In its campaign against ISPs, Avaya updated its customer agreements in 2008 to make explicit that PBX purchasers agreed not to use unauthorized third parties for

---

[8] *See United Asset Coverage, Inc. v. Avaya Inc.*, 409 F. Supp. 2d 1008, 1046 (N.D. Ill. 2006). That court's analysis was critical of the kind of monopolization and tying claims now brought by TLI. Because "the software built into Avaya's PBXs to facilitate their maintenance and repair is proprietary," the court rejected the argument that maintenance and hardware were separate antitrust markets. *Id.* at 1045-46. It also rejected the claim that Avaya had surprised its customers with a post-sale policy change, characterizing that monopolization claim as "border[ing] on the absurd" because "[n]o one has an unclouded crystal ball as to future events, nor does anyone have a vested right in the expectation that the future will remain the same as the present." *Id.* at 1046.

any service that required MSPs. Specifically, one license restriction stated that the

> Customer agrees not to ... allow any service provider or other third party, with the exception of Avaya's ... resellers and their designated employees ... to use or execute any software commands that cause the software to perform functions that facilitate the maintenance or repair of any Product except ... those software commands that ... would operate if ... [MSPs] were not enabled or activated.

(J.A. 7283.)

## 2.     PDS Systems and Maintenance[9]

The other Avaya equipment at issue in this case is the PDS system, the market for which is substantially smaller than the PBX market. Avaya presented evidence at trial that no more than 840 Avaya PDS systems were installed nationwide (about 20% of the total PDS market), with Avaya providing maintenance service to about 200 of those customers.[10] PDS systems tend to induce less long-term

---

[9] The phrase "PDS system" is redundant (because the "S" in PDS is "system"), but we use it for its colloquial ease, as the District Court did.

[10] Because of the relatively small size of the PDS maintenance market, none of Avaya's Business Partners has become a PDS maintenance provider.

14

intra-brand reliance than PBXs because the cost of an entirely new PDS is similar to the cost of upgrading an existing system.

The PDS market is similar to the PBX market in at least one important respect. In both, Avaya says, the profits from maintenance contracts help fund the development of new systems and the upgrades of existing systems. Avaya regularly updates its PDS software with patches to "fix bugs or adapt the product to changing circumstances." (Opening Br. at 14.) Prior to 2007, patches were available for free to PDS customers on Avaya's website; after 2007, customers who purchased new PDS systems could only receive patches if they purchased a minimum of one year of software support from Avaya.

### 3. The Dispute between Avaya and TLI

The two sides in this case present dramatically different stories of their dispute, which began in 2003.[11] Avaya's story is that it simply enforced long-standing policies against a disloyal former contractor that was breaching contractual duties and dishonestly undermining Avaya's relationships with its customers. TLI's version is that Avaya retroactively sprung an anticompetitive policy on its customers that prevented them from using ISPs, in order to

---

[11] Most issues before us are raised by Avaya, against whom the District Court entered judgment as a matter of law and against which a verdict was rendered. Nonetheless, both sides have appealed a variety of issues, and we endeavor to recount the facts neutrally.

vindictively force out of business a competitor who could provide better maintenance service at a lower cost.

From 1996 to 2003, TLI was an Avaya Business Partner and sold Avaya systems. Around 2000, Avaya launched a program to encourage Business Partners to offer maintenance services. TLI took the opportunity.[12] It claims it "invested millions in building its maintenance capabilities," while continuing to loyally sell Avaya PBX systems – reaching roughly five million dollars in sales in 2002. (Answering Br. at 5.)

The relationship between Avaya and TLI soured that same year, over TLI's efforts to compete for maintenance contracts with other Business Partners and with Avaya directly. Avaya had introduced a revised set of obligations for its Business Partners, the new program being set forth in what Avaya called the "Avaya One" agreement. The intent was to limit intra-brand competition and instead promote inter-brand competition by encouraging Business Partners to expand the total Avaya market rather than compete with each other. As TLI characterizes it, the Avaya One agreement was a malicious surprise sprung on the Business Partners who had invested in their maintenance business at Avaya's encouragement and were now restricted in their ability to compete for customers to get a return on that investment.

---

[12] Avaya had laid off many of its service technicians and engineers, and it offered to subsidize their salaries if Business Partners would employ them and begin to offer maintenance services.

16

The formal relationship between Avaya and TLI ended in 2003. TLI had refused to sign on to any agreement that would limit its ability to compete for maintenance clients. Instead, it negotiated a separate agreement with an Avaya agent, under which TLI was exempted from most of the rules against competing for existing maintenance business. When higher-ups at Avaya learned of this non-conforming deal, they invoked a termination provision of the contract in July 2003 that allowed them to end the deal on 60-days' notice.[13] The two sides' accounts again diverge as to what happened next.

According to TLI, Avaya jumped the gun on the 60-day notice period and began prematurely terminating TLI's access to its clients' systems, while notifying remaining Business Partners that they should poach TLI's clients. TLI says that Avaya then went on the warpath to sweep away ISPs, and that ODMC and MSP access restrictions were created to prevent ISPs from competing in the maintenance

---

[13] Formally, there were two Avaya One agreements in place, one between Avaya and TLI and one between Avaya and TeamTLI.com. For the TLI agreement, Avaya invoked the termination clause on July 31, 2003, so that it terminated on September 30. The TeamTLI.com agreement was finalized on July 24, Avaya served notice it was cancelling on September 24, and the termination was effective November 24. Because the agreement with TLI was the principal subject of Avaya's breach of contract claims, and because the District Court analyzed the two contracts in tandem, for simplicity we do not address them separately because there is no substantive difference that we are aware of, and the difference in termination dates is irrelevant.

market.  It claims that Avaya would keep customers in the dark about restrictions on ISP service until after the customers had already purchased an expensive system and were "locked in," at which point Avaya would deliberately misconstrue the license contracts to assert that ISP maintenance was prohibited.  TLI also accuses Avaya of other supposedly anticompetitive conduct, including shortening the PBX warranty period in an attempt to force customers to sign up for Avaya maintenance contracts and ending a program that allowed customers to gain MSP access without using an Avaya-authorized provider.  TLI argues that it was the target of particularly hostile action by Avaya.  First and foremost, TLI alleges that Avaya "sent threatening and misleading letters" to TLI's "current and potential customers, discouraging them from doing business" with TLI based on a claim that "unauthorized access to the PDS/PBX system [was] a violation of federal and state laws," a claim that TLI considers to be "without legal basis."  (Answering Br. at 9-10 (internal quotation and editorial marks omitted).)  Throughout this litigation, TLI has styled those letters as sowing "fear, uncertainty, and doubt" among its customers, and it has dubbed that correspondence the "FUD letters" for short.  Additionally, TLI accuses Avaya of "trespassing on [TLI's] customers' systems and disabling their access to critical maintenance software" (Answering Br. at 10), as well as punitively instituting this lawsuit against TLI.

In Avaya's much different narrative, TLI engaged in underhanded tactics to peel off Avaya customers in ways that violated both tort law and the contractual obligations of TLI and its customers.  According to Avaya, that unlawful conduct began when TLI, then still a Business Partner, improperly developed a disloyal commercial strategy based

on poaching Avaya customers. After TLI was terminated as a Business Partner, it continued to provide maintenance by using improperly acquired login credentials – either DADMIN logins gleaned from co-opted Business Partners or logins from customers who had MSP license agreements. To gain those logins, TLI convinced complicit Avaya Business Partners deceptively to submit login credential requests for certain TLI customers. TLI would then disconnect PBX systems from phone lines to prevent Avaya from changing the login passwords or from deactivating MSPs. Avaya also argues that TLI hired two former Avaya technicians to assist in tortious activity, one to "crack" Avaya login passwords and one to circumvent security systems in the software. All told, Avaya suggests that TLI made $20-34 million in profit from PBX maintenance using unlawfully-acquired access. This lawsuit was initiated as part of Avaya's efforts to halt TLI's allegedly illicit conduct.

## B. Procedural Background

Avaya filed suit on June 2, 2006, alleging a host of common law business torts, breach of contract, and violations of federal statutes, specifically the Digital Millennium Copyright Act and the Lanham Act. It sought both money damages and injunctive relief to halt TLI's practices. Those claims were refined over the following four years, eventually resulting in the Fourth Amended Complaint (the "Complaint"), filed in February 2010, which presented the claims as they went to trial.[14] TLI filed counterclaims,

---

[14] By the time of that Complaint, Avaya's claims against TLI were, in full, the following: misappropriation of trade secrets, tortious interference with contractual relations,

alleging numerous common law and federal antitrust violations and seeking both money damages and injunctive relief against what it considered Avaya's anticompetitive conduct.[15]

tortious interference with prospective economic advantage, fraud/ misrepresentation, violations of the Digital Millennium Copyright Act, false advertising and violations of the Lanham Act, trade libel and commercial disparagement, breach of contract, unfair competition, unjust enrichment, breach of the duty of loyalty, aiding and abetting former Avaya employees' misuse of proprietary information, and conspiracy

[15] Specifically, TLI alleged the following antitrust violations: monopolization and attempted monopolization of the PBX maintenance market in violation of § 2 of the Sherman Act, tying PBX maintenance and software patches in violation of § 1 of the Sherman Act, tying PBX upgrades and maintenance in violation of § 1 of the Sherman Act, monopolization and attempted monopolization of the PDS maintenance market in violation of § 2 of the Sherman Act, tying PDS maintenance and software patches in violation of § 1 of the Sherman Act, tying PDS maintenance and upgrades in violation of § 1 of the Sherman Act, and conspiracy in violation of § 1 of the Sherman Act. TLI also asserted common law counterclaims: tortious interference with business/contractual relations, tortious interference with prospective business or economic advantage, injurious falsehood and trade libel/slander, and breach of the implied covenant of good faith and fair dealing.

Pretrial proceedings lasted for seven years, comprising extensive discovery and motions practice, during which many of the claims were resolved. In 2012, TLI's common law claims were all dismissed by summary judgment. The District Court also dismissed TLI's antitrust claims that alleged illegal tying between PBX system upgrades and maintenance. In addition, Avaya voluntarily dismissed its federal statutory claims and several of its common law claims before trial.[16]

Some of the issues on appeal concern litigation conduct. TLI accuses Avaya of malicious litigation behavior, which allegedly cost TLI "millions of dollars in excess litigation costs and delayed resolution of the case for several years." (Answering Br. at 13.) Specifically, TLI accuses Avaya of abusing the discovery process by making copious and unnecessary requests for documents and admissions and delivering an excessive number of documents to TLI late in the proceedings. TLI suggests that Avaya knowingly pursued meritless claims, namely those that it voluntarily dismissed on the eve of trial. And TLI further alleges that Avaya "routinely produced inadequately-prepared corporate designees for deposition" (*id*. at 15), served excessively long expert reports, and litigated complex *Daubert* motions to be able to present experts, only to drop the experts and "substantial portions" of the expert reports at trial (*id*. (quoting J.A. 352)). Avaya denies any allegations of bad

---

[16] Those claims included misappropriation of trade secrets, tortious interference with contractual relations, violations of the Digital Millennium Copyright Act, violations of the Lanham Act, trade libel and commercial disparagement, and breach of the duty of loyalty.

21

faith conduct and defends its actions as nothing more than vigorous litigation in a complex case.

The trial began on September 9, 2013, opening with Avaya's remaining affirmative claims against TLI – for breach of contract, tortious interference with prospective economic gain, fraud, unfair competition, unjust enrichment, aiding and abetting former Avaya employees' misuse of confidential information, and civil conspiracy. As the District Court described it, Avaya's "jury presentation [] lasted two months, involved 35 witnesses, and spanned over 6,000 pages of transcript." (J.A. 190.)

TLI then moved for, and the District Court granted, judgment as a matter of law as to all of Avaya's affirmative claims. The gist of the Court's analysis was that TLI's customers were authorized to use the maintenance commands and to give them to TLI, so that TLI could not have breached contractual or tort duties by gaining access to those commands.

With Avaya's affirmative case thrown out, TLI then proceeded to present its antitrust counterclaims to the jury, with that portion of the trial spanning nearly four months. When the presentation of evidence concluded, the Court held a fifteen-hour conference with the parties to reconcile their voluminous proposed jury instructions, eventually settling on a set of instructions that ran for 80 pages. Eight distinct antitrust claims ultimately went to the jury.

On March 27, 2014, the jury returned a verdict, finding Avaya liable on two of the eight claims: (1) attempted monopolization of the PBX maintenance market, in violation

of § 2 of the Sherman Act, and (2) unlawfully tying PDS software patches to maintenance, in violation of § 1 of the Sherman Act. The jury awarded TLI $20 million in damages in a general verdict, which the Court trebled to $60 million in accordance with 15 U.S.C. § 15(a).

After trial, both sides filed post-trial motions, seeking either judgment as a matter of law or a new trial on the claims now appealed to us, and the District Court denied those motions. TLI also requested an injunction ordering Avaya to allow its PBX customers to give ODMC access to ISPs. The Court granted that injunction, but it limited it to PBXs sold before May 2008 because Avaya had by then included in its sales contracts language to put customers on clear notice that they could not use ISPs for maintenance. Finally, the Court granted TLI's motion for prejudgment interest under the Clayton Act, agreeing with TLI on several of its allegations that Avaya pursued non-meritorious claims in bad faith to prolong litigation. Ultimately, the District Court entered final judgment on September 16, 2014, awarding TLI $62,613,052.10. Avaya timely appealed, and TLI conditionally cross-appealed.[17]

---

[17] The District Court had jurisdiction under 28 U.S.C. §§ 1331, 1332, and 1367. We exercise jurisdiction pursuant to 28 U.S.C. § 1291.

23

## III.  Avaya's Appeals

### A.  Judgment as a Matter of Law on Avaya's Common Law Claims

We first take up Avaya's appeal of the District Court's grant of judgment as a matter of law on its common law claims against TLI for tortious interference with prospective business advantage, unfair competition, fraud, and breach of contract.[18]  Because all four claims are based on the same allegedly illicit conduct by TLI, we begin by providing a summary of the evidence of that conduct, as developed at trial.  We then apply the state law relevant to each of the four causes of action.  For each claim, we conclude that judgment as a matter of law was inappropriate.

A motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(a) "should be granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability."  *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993) (citation omitted).

> Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.  Thus, although the court

---

[18] Avaya does not appeal the grant of judgment as a matter of law against its claims for civil conspiracy, aiding and abetting a breach of loyalty, and unjust enrichment.

24

should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe.

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000) (internal quotation marks and citations omitted). Given that the District Court heard two months of testimony on Avaya's common law claims, judgment as a matter of law could only have been appropriate in the extraordinary circumstance that none of that evidence could lead a reasonable jury to find that TLI was liable on any one of the common law claims.

We exercise plenary review over the order granting the motion for judgment as a matter of law, and we apply the same standard as the District Court should have. *Lightning Lube*, 4 F.3d at 1166. Though the District Court ably supervised the introduction of volumes of evidence and was attentive in managing this complex case, we cannot help but conclude that its decision to grant TLI's motion for judgment as a matter of law was irretrievably flawed. Avaya provided ample proof of conduct that could support its common law claims, much of which was uncontroverted and came directly from the testimony of TLI executives themselves. While we have high regard for the fine jurist who was at the helm in the District Court, this case is a reminder that "judgment as a matter of law should be granted sparingly." *Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).

## 1. Evidence Supporting Avaya's Common Law Claims

Avaya presented evidence that TLI engaged in conduct that was at best ethically dubious, and quite possibly unlawful. To summarize the conduct at issue, it is undisputed that TLI enlisted former Avaya employees to "hack" and "crack" Avaya systems, that it submitted deceptive requests for login access, and that it used Avaya's proprietary knowledge – gained while still Avaya's Business Partner – to compete directly against Avaya. As a result, TLI was able to lure a significant amount of business away from Avaya and its Business Partners. TLI's surreptitious business dealings and its executives' own admissions of secrecy belie any claim that it thought its own conduct was fair and proper.

### a. Evidence of Unlawful Activity

### i. Hacking and Cracking

The first method TLI used to hack into its clients' Avaya systems was hiring former Avaya employee Dave Creswick to crack logins and passwords. Creswick knew that TLI needed the passwords "[t]o do their maintenance" in competition with Avaya. (J.A. 2277.) He would hack into systems and activate MSPs on TLI's clients' systems, and he also activated DADMIN login access several times.

The evidence introduced at trial of the Creswick hacking scheme was copious, and came mostly from the testimony of TLI executives themselves. Chief Technology Officer Scott Graham acknowledged that TLI paid Creswick to "enable some logins and MSPs" (J.A. 2292) and that it

began paying Creswick for this service while TLI was still under contract as an Avaya Business Partner. CEO Douglas Graham acknowledged using Creswick as an "ex-Avaya employee [to] create a new password for the system[s]." (J.A. 2747.) Avaya introduced an email in which Douglas Graham offered Creswick "a flat rate of $300 a password for single situations and $200 a password if you do more [than] one password at a time." (J.A. 6117.) In another email, Creswick bragged to Douglas Graham that "there has not been [an Avaya PBX] system created that I cannot get into." (J.A. 6059.) TLI eventually developed additional means to access Avaya PBXs, and by 2008, it had begun to "read [] passwords" for itself, using a method similar to (but simpler than) Creswick's. (J.A. 2361.)

TLI also hacked Avaya systems by hiring another former Avaya employee, Harold Hall, who used software "provided by Avaya" during his time as an Avaya employee to "beat" Avaya's security systems. (J.A. 2293). Hall had taken the software, called an "ASG key," with him when he left Avaya's employment. He acknowledged at trial that he did not receive permission from Avaya to do so. Scott Graham admitted that Hall's method was necessary to overcome "an additional security method that was implemented by Avaya on certain releases of the ... PBX software." (J.A. 2365.) He conceded that he knew "Hall had [software] provided to him by Avaya" and that he "believe[d] [Hall] used it through most of his career at Avaya" before using that software "subsequently as a contractor." (J.A. 2366.) In his own testimony, Hall estimated that he had used the ASG key for TLI "40 [to] 60" times. (J.A. 3057.)

### ii. Deceptive Access Requests

The second way that TLI gained access to Avaya's PBX systems was to cajole Avaya Business Partners into submitting deceptive requests for login access. As Scott Graham characterized it, TLI would "work[] with several Business Partners" to have them "submit[] a DADMIN form at the customer's request" – but, unbeknownst to Avaya, TLI would be the ultimate user. (J.A. 2293.) Graham acknowledged that, if Avaya had known that TLI was behind the request, it would not have enabled the DADMINs because Avaya was "doing everything [it] could to put [TLI] out of the maintenance business." (J.A. 2338.) Therefore, as Graham put it, the submissions "did not identify [TLI] on there" and "did not have [TLI's] name on there to identify to Avaya that [the customer] was also a customer of [TLI's]." (J.A. 2338.) In response to an interrogatory, TLI identified seven Business Partners who cooperated in the scheme to send access requests "that resulted in the activation of DADMIN logins" that were used by TLI. (J.A. 3041.)

### iii. Disloyal Use of Knowledge Gained As Avaya Business Partner

TLI's third method for surreptitiously gaining access to Avaya systems was to rely on proprietary information learned when it was under contract as an Avaya Business Partner. Scott Graham testified that "108 locations or about 8 percent" of the PBX systems that TLI serviced "were systems for which TLI provided maintenance using a login that it had obtained from Avaya when TLI was a Business Partner."

28

(J.A. 2423.) An additional "17 percent" of TLI's maintenance business was for "systems that were ... using a default login or password." (J.A. 2424.) TLI "did indeed learn of [those default passwords] during the time that [TLI was] a Business Partner." (J.A. 2332.)

### iv. Subjective Knowledge of Wrongful Conduct

Avaya also presented evidence that TLI knew that Avaya considered maintenance access to be proprietary and that TLI deliberately acted in secret to gain system access, from which a jury could infer malice or bad faith. Scott Graham admitted in his testimony that TLI "hid [its] activities from Avaya" and that the information about how TLI gained access was "carefully guarded" when dealing with customers – though he denied providing customers with affirmatively false information. (J.A. 2293-94.)

TLI actually went to great lengths to conceal its activities from Avaya. Scott Graham acknowledged that if Avaya knew that TLI was behind the vicarious DADMIN login requests, it would not have provided them. Accordingly, TLI would have customers sign blank request forms and would not disclose to them the identity of the Business Partner that would actually submit the form, because "if the Business Partner was identified to the customer, that could get back to Avaya." (J.A. 2345.) TLI believed (no doubt rightly) that if Avaya learned of that practice, it would have intervened to stop the unauthorized access.

As for the hacking schemes, Douglas Graham acknowledged that "it was very important to [TLI] that Avaya

29

didn't know about Mr. Creswick." (J.A. 2748.)  In an email, Graham wrote that one way TLI got "access to [Avaya] systems" was "having an ex-Avaya employee create a new password for the system," and he suggested that "[i]f [Avaya] knew of" the manner in which TLI was getting access, it "would probably be raising it" in litigation.  (J.A. 6363-64.) TLI executive Bruce Shelby testified that TLI would make customers sign non-disclosure agreements before revealing who its subcontractors were, for fear that Avaya would find out and "put pressure on all the Business Partners that were on our subcontractor list not to work with us."  (J.A. 2986.) He also testified that TLI did not want Avaya "to find out ... how TLI was gaining access to the on-demand maintenance commands." (J.A. 2997-98.)

Testimony also established that TLI acted to obfuscate its practices when dealing with its own customers.  For example, when Avaya changed its customer contract language regarding DADMIN access, Scott Graham sent an email to TLI leadership suggesting a tactic to conceal the firm's methods:

> In light of Avaya's recent changes in contract language regarding [DADMIN] specifically, we want to eliminate that word from our vocabulary when talking to customers.
>
> When we refer to logins - we want to simply refer to them as "service logins[."]  ...
>
> Obviously, some customers will ask pointed enough questions, that we will need to

> be more descriptive, but as a default we want to change our message.

(J.A. 5817.) The obfuscation apparently worked; in fact, two of TLI's customers testified that they did not know that TLI was not an authorized maintenance provider when they hired the firm.

TLI also took preemptive actions to prevent Avaya from interrupting its activities. According to Scott Graham's testimony, TLI knew that the MSPs were licensed by Avaya to each customer and that the licenses "all implied" that "Avaya could shut [the MSPs] off" at the end of a customer's contractual relationship with Avaya. (J.A. 2382.) Therefore, as Douglas Graham put it in an email, TLI would "tak[e] over the system" of a customer it had successfully solicited, "before Avaya ha[d] time to turn the [MSPs] off, or change the passwords," which was "simply done by disconnecting the phone line that links Avaya to the customer's system." (J.A. 6363.) Similarly, Harold Hall testified that he would access the Avaya systems using the DADMIN logins he had cracked with the software he had walked away with when he quit Avaya, and then he would change the DADMIN password. He testified that the practice was a "routine thing" that TLI did, and that it ensured that "nobody other than [TLI could] access that [system] using the DADMIN login." (J.A. 3055.) One TLI employee testified that she was instructed to tell customers who were cancelling a contract with Avaya to "change the line that they had in place" and to "change a password," all "so that Avaya couldn't access the system." (J.A. 2463.)

31

### b.      Harm to Avaya

All of the common law claims at issue have as an element that Avaya establish actual damages resulting from TLI's unlawful activity. At trial, Avaya presented evidence of several avenues through which TLI's alleged misappropriation of maintenance access caused it financial harm.

First, Avaya lost license revenue when TLI provided the misappropriated access to its customers, who would otherwise have had to license access from Avaya. Scott Graham testified that TLI provided customers with logins that went beyond the base customer logins. Douglas Graham testified to a specific instance in which TLI provided a high-level password to a client so that the client would "not have to pay Avaya for MSPs." (J.A. 2720.) Shelby testified that TLI would "tell prospective customers that they did not need to pay for MSPs if they were to become a TLI maintenance customer," "because [TLI] had another method to gain access." (J.A. 3033.)

Second, TLI would itself sell passwords to customers, as was established by Douglas Graham's testimony. He described how TLI charged "setup fees" for customers who needed a new password. (J.A. 2750.) Also, "[t]here was a time where [TLI] would charge customers if [TLI] had to get a second password." (J.A. 2750.) That TLI revenue gained by selling Avaya's proprietary information could be a basis for disgorgement damages.

Third, and most importantly, the allegedly misappropriated access enabled TLI to compete directly with

32

Avaya for maintenance customers, costing Avaya profit in its high-margin maintenance business. Scott Graham testified that, from 2001 on, TLI competed with Avaya for maintenance dollars. Douglas Graham acknowledged that, since that time, TLI "marketed ... its own maintenance, to existing Avaya maintenance customers," and he identified one customer in particular that TLI "took over" from Avaya. (J.A. 2704-05.) Shelby acknowledged that TLI "targeted PBX owners with existing maintenance contracts because they were the ones ... who were most likely to spend money on PBX maintenance." (J.A. 2983.) He also stated that, of those existing maintenance contracts, "[t]he vast majority were with Avaya." (J.A. 2983.)

Avaya presented evidence that TLI's ability to compete for that business depended on the maintenance access that Avaya contends was misappropriated. Scott Graham agreed that "unless [TLI] could access the maintenance commands built into the software, [it] couldn't ... do the maintenance." (J.A. 2385.) He also stated that "[s]ome of the services" offered by TLI for the PBX maintenance at issue "do require the maintenance commands." (J.A. 2294.) And he acknowledged that "generally" the commands at issue "can't be executed by a customer level login with no MSPs," hence requiring a higher-level login of the type that was gained by the various means just described. (J.A. 2294.)[19]

---

[19] Avaya presented a specific example through the testimony of one maintenance client who was courted by TLI. That witness testified that his firm had traditionally used Avaya maintenance (either directly or through Business Partners), switched to TLI under the mistaken belief that it

33

The competition for business was especially costly to Avaya because maintenance was a major driver of the profits from its PBX and PDS systems.[20] Avaya's profit margin on the sale of PBX systems was substantially lower than its profit margin on the whole range of maintenance products.

---

was a Business Partner, then terminated that arrangement upon discovering that TLI was not "able to provide [them] with the proper login credentials to support and administer the system" and thereafter "went back to Avaya for support." (J.A. 2510.) Avaya therefore presented not only generalized evidence that TLI's maintenance contracts were at Avaya's expense, but a concrete example of how that substitution worked.

[20] Indeed, Douglas Graham noted in an email that Avaya would frequently take losses in order to retain its extant maintenance contracts, another facet of TLI's competitive strategy:

> TLI continues to have significant success in taking over existing Avaya maintenance contracts. Even when TLI loses, in most cases Avaya has to take a significant loss to win the deal. For example, TLI just lost International Paper. At the time of TLI's proposal, International Paper was paying Avaya over $4,000,000 a year. TLI's proposal was for $2,800,000 a year. I have not gotten all the details, but I am confident that Avaya had to partner with a Business Partner and take a significant loss to keep TLI from winning this deal.

(J.A. 6363.)

Even if Avaya did not retain the customer as a direct service client, the two other authorized routes for customers to obtain maintenance service – purchasing service from a Business Partner or purchasing licenses for self-maintenance – would also have benefited Avaya financially. As an Avaya executive testified, when a customer signs on with a Business Partner, it becomes a "customer ... that [Avaya] can look to sell additional products to." (J.A. 2065) In some cases, the Business Partner would in turn sell Avaya maintenance service, providing direct revenue to Avaya. Even if the Business Partner sold its own branded maintenance, any such service was "going to ... include[] ... some Avaya content," hence yielding business for Avaya. (J.A. 2569.) [21]

Moreover, if the jury credited Avaya's case, it would have been able to apportion damages to different conduct, because it had evidence of TLI's total maintenance earnings and the proportion of maintenance attributable to each form of allegedly unlawful access. Avaya's accounting expert testified that, depending on which profit model was believed (the plaintiff's or the defendant's), TLI made between $20,260,092 and $31,160,190 from its maintenance of Avaya PBX systems between 2003 and 2010. TLI's own analysis concluded that its maintenance services were based on logins procured in the following proportions: 8% was "obtained

---

[21] Not incidentally, a maintenance relationship either directly with Avaya or with an authorized Business Partner also allowed Avaya to assert quality control over maintenance, which helped protect the value of Avaya's brand reputation. When it came to independent providers, Avaya was "concerned about the quality of maintenance service that the customer receives." (J.A. 2065.)

from Avaya when TLI was a Business Partner" (J.A. 2423); 1% was using "a well-known Business Partner password" (*id.*); 5% was based on deceptive requests from other Business Partners; 24% was "obtained through Mr. Creswick" (J.A. 2424); 28% was "using a login that the customer had provided it access to" (*id.*); 17% was obtained through a "default login or password" (*id.*); and 16% was "obtained internally," including "through use of the known key with Mr. Hall" and TLI's internally-developed cracking method (*id.*). If the jury found each of those courses of conduct to be unlawful, the total would account for 99% of the profit that TLI garnered from its Avaya PBX maintenance business. Even limiting the analysis to just the more obviously problematic conduct – deceptive log-in requests, hacking and cracking, and using passwords TLI gained as a Business Partner – it accounts for 53% of TLI's business.

With all the foregoing considerations taken together, we conclude that Avaya presented substantial evidence that, but for TLI's competition, made possible only by its alleged theft of proprietary information, Avaya would have received a significant portion of the money TLI's clients spent on maintenance. Further, it would have been feasible for the jury to attribute particular losses to particular conduct.

## 2. Customer Contract Interpretation

In granting judgment as a matter of law to TLI on Avaya's common law claims, the District Court largely relied on its ruling that Avaya's contracts with its equipment customers entitled those customers to give TLI access to their systems to perform maintenance. The District Court ruled that, as a matter of law, "Avaya failed to prove the software

36

licensing agreements entered into by TLI's 470 customers upon purchasing their PBXs prohibited them from allowing TLI[] to access the ODMCs on their systems." (J.A. 201.) Because that threshold legal determination was so central to the rest of the District Court's analysis, we turn to considering whether it was correct.

There is no dispute that New Jersey law governs this issue, according to the choice of law provision in the customer contracts, and under New Jersey law, "discerning contractual intent is a question of fact unless the provisions of a contract are wholly unambiguous." *Jaasma v. Shell Oil Co.*, 412 F.3d 501, 507 (3d Cir. 2005) (interpreting New Jersey law) (internal quotation marks and modifications omitted) (quoting *In re Barclay Indus., Inc.*, 736 F.2d 75, 78 n.3 (3d Cir. 1984)). "An ambiguity in a contract exists if the terms of the contract are susceptible to at least two reasonable alternative interpretations." *M.J. Paquet, Inc. v. N.J. Dep't of Transp.*, 794 A.2d 141, 152 (N.J. 2002) (quoting *Nester v. O'Donnell*, 693 A.2d 1214, 1220 (N.J. Super. Ct. App. Div. 1997)). When that is so, it is permissible to look to evidence outside the contract "as an aid to interpretation." *Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am.*, 948 A.2d 1285, 1289 (N.J. 2008) (citation omitted).

Two sets of license agreements are in dispute, those before and those after 2007. Each is the subject of a distinct question. For the pre-2007 agreements, the question is whether it was ambiguous that they permitted licensees – *i.e.*, Avaya customers – to provide access to ISPs. The post-2007 agreements unambiguously barred giving such access, but it is disputed whether Avaya's customers actually entered into those agreements. We conclude that, for both sets of

37

agreements, Avaya presented sufficient evidence to at least create disputes of material fact, so that those questions should have been answered by the jury, not the Court.

In ruling that PBX license agreements unambiguously gave purchasers a right to use maintenance commands and to provide access to third parties, the District Court relied on language from the "Purchase/Service Agreement." The Court's conclusion was based on a provision in "[l]icensing agreements used from 1990 to 2003," which "granted the purchaser 'a personal, non-transferable and non-exclusive right to use ... all software and related documentation furnished under this agreement.'" (J.A. 204 (quoting license agreement, an example of which is at J.A. 5856).) In the District Court's reading, that language gave Avaya PBX customers a "personal ... right" to use MSPs, which the Court viewed as "software ... furnished under this agreement." In the Court's view, that right to use MSPs extended to the customer's maintenance provider, whether an employee or an independent contractor such as TLI.[22]

---

[22] In 2003, Avaya updated the agreements. It left the quoted language in place but added a new clause stating that the "[c]ustomer will make the Software available only to employees, contractors, or consultants with a need to know, who are obligated to comply with all license restrictions contained in the Agreement and to maintain the secrecy of the Software." (*E.g.*, J.A. 5241.) The District Court interpreted the language about "contractors[] or consultants" to be "consistent with the ... construction of licensing agreements that allow third-party use for the licensee's benefit." (J.A. 205 n.26.) It therefore considered that contract term to be evidence that PBX owners were permitted to use independent

38

Avaya challenges the District Court's interpretation of those agreements, arguing that the MSPs required to perform maintenance were not in fact "furnished under" the Purchase/Service Agreement, so that customers did not have a "right to use" them. (Opening Br. at 30.) Instead, MSPs were "licensed separately through an MSP Addendum ... or Maintenance Assist agreement." (*Id*.) "Avaya delivered new equipment with MSPs turned off, enabled them only if customers signed a separate ... agreement, and disabled them if that agreement expired." (*Id*.) Although customers could maintain their PBX systems without MSPs, it was "just not as efficient" to do so without the remote access that MSPs allowed (J.A. 1995) – hence the value of executing an agreement to activate MSPs.

We do not need to answer who has the better reading of the contracts because, at a minimum, they are ambiguous, and the District Court erred in ruling that Avaya's reading is untenable. MSPs may have been embedded in the software given to customers, but customers' ability to access them required a separate purchase from Avaya. If the District Court's interpretation were correct, then any time a customer downloaded a piece of software that had components requiring additional payment and permissions, courts would treat the entire software and all its components as having been "furnished" to the customer in the original purchase. That is questionable, and the contrary interpretation is, at the very least, plausible. Moreover, given that Avaya's business model was dependent on selling base equipment and then licensing and enabling additional features such as MSPs, the

contractors for maintenance and to provide them with system access.

39

conclusion that those features were unambiguously meant to be "furnished" in the base purchase is far from clear. As Avaya points out, "[h]undreds of self-maintenance customers paid Avaya for ... access commands," which would "make no sense if the Purchase/Service Agreements already entitled customers" to them. (Opening Br. at 32.) Avaya, its customers, and even TLI did not read the agreements that way before the lawsuit, and the District Court erred in declaring that the terms were unambiguously contrary to all the parties' understandings.

Avaya also notes that in 1999, the agreements were modified to include a provision that a customer "will not enable or attempt to permit any third party to enable software features or capacity (e.g. additional storage hours, ports, or mailboxes) which Avaya licenses as separate products without Avaya's prior written consent." (J.A. 205 n.24.) Based on that language, Avaya argues that customers were barred from allowing an ISP to enable features, such as MSPs, without Avaya's consent. The District Court, however, did not consider that provision to apply to MSPs. It read the list of enumerated examples – "storage hours, ports ..., and voice mailboxes" – to be "clearly incongruous" with MSPs. (*Id.*) Accordingly, the Court ruled that MSPs were unambiguously not a "feature[] or capacity" subject to the provision's restrictions.

For much the same reasons that we disagree with the District Court's construction of the "furnished under" language, we also conclude that it was improper to determine that terms "features or capacit[ies]" were unambiguous and did not apply to MSPs. Storage hours, additional ports, and mailboxes are some examples of the add-ons that Avaya

licensed separately, but MSPs and ODMCs that provided remote maintenance access might rationally be viewed by a jury as being just as much "features" that enhance a customer's use of a PBX system.[23] Not only did customers' behavior provide some corroboration of Avaya's interpretation of the contract, TLI's did as well. If the agreements unambiguously permitted customers to give TLI access to MSPs, there would have been little reason for its secretive efforts to gain maintenance access. Indeed, Scott Graham was asked at trial whether he "knew that MSPs were not part of the original sale of the PBX to the customers," and he responded: "Yes, and that was one of the big problems." (J.A. 2303.) In light of the imprecision of the words "features" and "capacity" and the extrinsic evidence

---

[23] TLI argues that, in Avaya's "detailed 'feature' manuals," Avaya "did not *once* identify MSPs as a 'feature.'" (Answering Br. at 84 (citing J.A. 2407).) We agree that testimony about those features manuals, and the absence of any mention of MSPs in them, would be relevant for the jury to consider in interpreting the meaning of the 1999 modifications. But, as an Avaya system engineer put it at trial, the PBX software is "able to do a vast number of things," and customers could pick and choose which "aspects of the software" to purchase. (J.A. 1886.) That Avaya chose to highlight more glamorous capacities in its features manuals – instead of intermediate commands and functions that allowed remote-access maintenance – does not foreclose a jury determination that such access was indeed a feature of the product. Given that so few customers performed their own maintenance, that lack of emphasis may make perfect sense to a jury.

supporting Avaya's interpretation of the contract, we conclude that the District Court erred in ruling as a matter of law that the 1999 additions to Avaya's PBX contracts unambiguously did not apply to MSPs.

Having resolved that the District Court erred in construing the pre-2007 customer contracts to be unambiguously contrary to Avaya's interpretation, we turn to the post-2007 agreements.[24] The District Court acknowledged that the 2007 version of the licensing agreement clearly "obligated the purchaser to refrain from using a third-party maintenance provider,"[25] but it ruled that "Avaya did not introduce any evidence indicating that [TLI's]

---

[24] The District Court made note of the fact that only "eight out of [TLI's] 470 customers purchased their PBXs in 2007 or after," and that the 2007 contract modification "came into existence well after Avaya initiated the instant suit in June of 2006." (J.A. 206-07 n.27.) Although allegedly unlawful access to post-2007 systems may not have been a large contributor of TLI's business or the motivation for Avaya's suit, that goes to the question of damages, not liability.

[25] The agreement provided that the "[c]ustomer agrees not to ... allow any service provider or third party, with the exception of Avaya's authorized channel resellers and their designated employees ... to use or execute any software commands that cause the software to perform functions that facilitate the maintenance or repair of any Product except that a service provider ... may execute those software commands that ... would operate if ... [MSPs] were not enabled or activated." (J.A. 7283.)

42

customers signed such a licensing agreement, and consequently this iteration of the agreement cannot be used to prove that [TLI's] customers were prohibited from granting TLI[] access to the ODMCs on their PBXs." (J.A. 206.) Again, the Court was wrong.

Avaya did present sufficient evidence to establish a dispute of material fact, which should have gone to the jury. The form agreement itself was in evidence, and an Avaya employee testified that the standard form agreements as of 2008 included the specific reference restricting use of MSPs. That employee also explained that the forms were crafted by a "forms committee" that ensured that uniform terms and conditions were "incorporated into the templates," which were then incorporated into "procedures under which [Avaya] used form agreement[s]" for PBX equipment, software, and maintenance sales. (J.A. 2615.) Given the evidence of Avaya's centralized form-drafting procedure, an example of an actual prototypical form, and examples of earlier generations of forms that were in fact signed by customers, a jury could have reasonably found that the post-2007 form agreements were in fact reflective of PBX purchasers' license obligations. It was thus improper for the District Court to resolve the question as a matter of law rather than leave it to the jury.

43

### 3. Tortious Interference with Prospective Business Advantage

We now turn to the specific claims that Avaya asks us to revive. We first consider count three of its Complaint, in which Avaya set forth a claim for tortious interference with prospective economic advantage.

As a federal court sitting in diversity, and as is undisputed by the parties, we are obligated to apply New Jersey's law to the tort claims. *See Lorenzo v. Pub. Serv. Coordinated Transp.*, 283 F.2d 947, 948 (3d Cir. 1960) (per curiam). In *Printing Mart-Morristown v. Sharp Electronics Corp.*, the Supreme Court of New Jersey held that, in a claim of tortious interference with prospective business advantage, "[w]hat is actionable is '[t]he luring away, by devious, improper and unrighteous means, of the customer of another.'" 563 A.2d 31, 36 (N.J. 1989) (quoting *Louis Kamm, Inc. v. Flink*, 175 A. 62, 66 (N.J. 1934)). To prevail on such a claim, Avaya "was required to show [1] that it had a reasonable expectation of economic advantage, [2] which was lost as a direct result of [TLI'C's] malicious interference, and [3] that it suffered losses thereby." *Ideal Dairy Farms, Inc. v. Farmland Dairy Farms, Inc.*, 659 A.2d 904, 932 (N.J. Super. Ct. App. Div. 1995) (citation omitted).[26]

---

[26] We earlier parsed New Jersey law to further subdivide the tort, essentially by breaking out the second part of the *Ideal Dairy Farms* formulation into three elements. As we put it then, the tort comprised five elements:

> 1) a plaintiff's reasonable expectation of economic benefit or advantage, (2) the defendant's knowledge of that expectancy, (3)

In terms of the first element – protectable economic expectations – the Supreme Court of New Jersey has held that "[i]t is not necessary that the prospective relation be expected to be reduced to a formal, binding contract," and that such prospective relations include "the opportunity of selling or buying land or chattels or services, and any other relations leading to potentially profitable contracts." *Printing Mart*, 563 A.2d at 39 (quoting Restatement (Second) of Torts § 766B cmt. c (1979)). Courts have found "a reasonable expectation of economic gain in as slight an interest as prospective public sales." *Id*. at 38 (collecting cases).

Protectable economic expectations can arise from both existing and potential customers. "Tortious interference developed under common law to protect parties to an *existing or prospective* contractual relationship from outside interference." *Id.* at 38 (emphasis added) (citation omitted). Satisfaction of the first element does not turn on whether the customer is characterized as current or prospective, but rather whether the facts of the case "giv[e] rise to some 'reasonable

> the defendant's wrongful, intentional interference with that expectancy, (4) in the absence of interference, the reasonable probability that the plaintiff would have received the anticipated economic benefit, and (5) damages resulting from the defendant's interference.

*Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 186 (3d Cir. 1992) (citing *Printing Mart*, 563 A.2d at 37; Restatement (Second) of Torts § 766B)).

45

expectation of economic advantage.'" *Id.* at 37 (quoting *Harris v. Perl*, 197 A.2d 359, 363 (N.J. 1964)).[27]

The second element – malicious interference – requires only "the intentional doing of a wrongful act without justification or excuse." *Id.* at 39 (quoting *Louis Schlesinger Co. v. Rice*, 72 A.2d 197, 203 (N.J. 1950)). Wrongful conduct, always viewed in the specific context of the case presented, is generally defined by reference to custom in the industry. It is conduct that "would not be sanctioned by 'the rules of the game.'" *Id.* at 40. "[T]he line must be drawn where one competitor interferes with another's economic advantage through conduct which is fraudulent, dishonest, or illegal." *Ideal Dairy Farms*, 659 A.2d at 936 (citation omitted). A benign, or pro-competitive, motive does not absolve misconduct. "While competition may constitute justification, a defendant-competitor claiming a business-

---

[27] *Printing Mart* illustrates how broad a protectable prospective economic advantage may be. The corporate plaintiff had performed printing services for Sharp Electronics for several years. When Printing Mart submitted a bid on the latest Sharp project, there was evidence that Sharp employees rigged the bidding process to enable a Printing Mart competitor to win the contract. Printing Mart sued Sharp, three of its employees, and three competitors for intentional interference with prospective economic relations. The trial court dismissed the complaint on the basis that no contract obligated Sharp to do business with Printing Mart. The Supreme Court of New Jersey reversed, holding that, although a complaint based on tortious interference must allege facts that show a protectable right, the right "need not equate with that found in an enforceable contract." *Printing Mart*, 563 A.2d at 37.

related excuse must justify not only its motive and purpose but also the means used." *Id*. at 933 (citation omitted).

In *Lamorte Burns & Co. v. Walters*, the Supreme Court of New Jersey held that the "taking of plaintiff's confidential and proprietary property and then using it effectively to target plaintiff['s] clients, is contrary to the notion of free competition that is fair." 770 A.2d 1158, 1172 (N.J. 2001). In that case, two of Lamorte's employees collected information on its clients with the purpose of using it to start their own business in direct competition with Lamorte. *Id.* at 1162. The court held that such conduct was sufficient to make out a claim of tortious interference, so that the targeting of a company's current clients was sufficient to ground a tortious interference claim. *Id.* at 1172.

For a plaintiff to establish the third element, loss and causation, there must be "proof that if there had been no interference there was a reasonable probability that the victim of the interference would have received the anticipated economic benefits." *Printing Mart*, 563 A.2d at 41 (quoting *Leslie Blau Co. v. Alfieri*, 384 A.2d 859, 865 (N.J. Super. Ct. App. Div. 1978)). As the Appellate Division of the New Jersey Superior Court has explained, "[i]t is sufficient that plaintiff prove facts which, in themselves or by the inferences which may be legitimately drawn therefrom, would support a finding that, except for the tortious interference by the defendant with the plaintiff's business relationship with [another party], plaintiff would have consummated the sale and made a profit." *McCue v. Deppert*, 91 A.2d 503, 505-06 (N.J. Super. Ct. App. Div. 1952).

The District Court here decided that TLI's access was not itself wrongful and that, therefore, Avaya's tortious

47

interference claim must fail. That conclusion rested on two propositions: first, that Avaya had previously allowed TLI to provide maintenance, and, second, that "customers' licensing agreements specifically allow[ed] for third-party service providers." (J.A. 226.) Both those propositions are problematic in ways that undermine the District Court's decision.

As to the first point, the District Court was wrong to conclude that TLI was entitled to access ODMCs merely because it had been allowed to do so while it was an Avaya Business Partner. Of course TLI was permitted access when it was a contractual partner of Avaya's, but the District Court provided no rationale to explain why that access survived the termination of that relationship. By close analogy, former employees in *Lamorte* were entitled to use their employer's proprietary customer information while they were working for that employer, but they were not entitled to use that information when they left to become competitors. 770 A.2d at 1172. Likewise, TLI was entitled to access ODMCs when it was an authorized Avaya Business Partner, but there is no reason it could expect that its access to proprietary software and logins would survive when it struck out on its own to compete directly against Avaya.

As to the second point, we have already explained in detail why the District Court erred in concluding that Avaya customers were unambiguously entitled to give TLI remote access to perform maintenance. Even if the District Court were correct, however, that would not immunize TLI from a tortious interference claim when it comes to stealing away customers who had service contracts with Avaya. In *Wear-Ever Aluminum, Inc. v. Townecraft Industries, Inc.*, the

48

Chancery Division of the New Jersey Superior Court emphasized that, even though the plaintiff company's contracts with its employees were terminable at will, that did not permit a third party to interfere with the employment relationship. 182 A.2d 387, 393 (N.J. Super. Ct. Ch. Div. 1962). Even if the contract in question permits an act eventually taken by a customer, "a stranger to the contract may not exercise his will in substitution for the will of either of the parties to the contract." *Id.* Moreover, even if TLI could have lawfully obtained access to MSPs and ODMCs from Avaya's customers, that did not insulate it from tort liability for the methods it actually used to access the maintenance commands. If a homeowner gives a neighbor permission to borrow tools, the neighbor is not thereby insulated from a trespass suit if he chooses to break into the garage to get them.

Having rejected the District Court's assessment of those two threshold matters, we turn next to its application of a multifactor test for tortious interference from the Restatement (Second) of Torts § 767 (1979).[28] Assuming for the moment that the Court was applying the right test – and

---

[28] The District Court cited *Printing Mart*, 563 A.2d at 752, for the proposition that New Jersey courts have adopted the multi-factor test from the Restatement. In fact, *Printing Mart* adopted § 766B, but subsequent case law from the Supreme Court of New Jersey suggests that § 767 is also persuasive. *See Nostrame v. Santiago*, 61 A.3d 893, 901 (N.J. 2013) ("In determining whether the conduct complained of is improper, the *Restatement* offers general guidance, identifying a variety of relevant considerations." (citing Restatement (Second) of Torts § 767)).

we think looking to the case law may have been more productive – the District Court nonetheless misstepped in its legal ruling. Section 767 lists the following factors for consideration:

> (a) the nature of the actor's conduct,
> (b) the actor's motive,
> (c) the interests of the other with which the actor's conduct interferes,
> (d) the interests sought to be advanced by the actor,
> (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
> (f) the proximity or remoteness of the actor's conduct to the interference and
> (g) the relations between the parties.

The factors in that test are laden with subjective value judgments that will rarely be answerable as a matter of law. Nonetheless, and in the face of the already-recounted unflattering evidence against TLI, the District Court concluded that "[e]very single factor strongly indicates that [TLI's] conduct d[id] not rise to the level ... the law proscribes." (J.A. 227.) We disagree.

First, the District Court stated that TLI acted with proper competitive motive and interest.[29] But, even assuming

---

[29] Although the District Court was not explicit in enumerating which factors of the Restatement's seven-factor test it was considering, we infer from its argument that it here considered factors (a), (b), and (d) together – respectively, the

50

that were true, a pro-competitive motive or interest does not absolve misconduct that falls afoul of the first factor's consideration of the nature of the conduct. Again, "[w]hile competition may constitute justification, a defendant-competitor claiming a business-related excuse must justify not only its motive and purpose but also the means used." *Ideal Dairy Farms*, 659 A.2d at 933.

Second, the Court considered the nature of the protected interest, and it observed – without further comment or citation to authority – that "the law does not protect as forcefully a firm's economic interest in possible, future customers as it does interests in contracting parties." (J.A. 228.) Whether or not that is true, TLI was in fact interfering with Avaya's relationships with then-existing maintenance customers. There was nothing speculative, or underwhelming, about that economic interest.

Third, in considering society's interest, the District Court found that TLI's conduct "brought greater competition to the market and challenged widespread and vexatious threats of litigation." (J.A. 228.) We do not believe the District Court was in a position to weigh the relative social merits of TLI's conduct with Avaya's proprietary interests in its software and its legitimate business expectations with its maintenance customers. That is exactly the kind of factual and ethical determination meant for the jury rather than the Court.

---

nature of TLI's conduct, its motive, and the interests it sought to advance.

Fourth, in considering the proximity of TLI's conduct to the interference, the District Court emphasized that TLI's "interference was far removed from their allegedly improper conduct" because it only accessed the ODMCs after the customer in question had left Avaya. (J.A. 229.) But the customers never would have left Avaya if TLI had not been able to promise ODMC access. The allegedly tortious conduct that enabled that access was therefore the *sine qua non* of TLI's business.

Finally, in considering the relations of the parties, the District Court determined that that factor "counsels for a finding of lawful conduct, as a mere four months after it signed the modified Avaya One agreement, and not long after originally encouraging TLI to invest in its maintenance business, Avaya cancelled the contract, thereby jeopardizing [TLI's] monetary investment and business model." (J.A. 229-30.) That TLI chose to compete against Avaya rather than accept the standard Business Partner arrangement – and therefore prompted Avaya to terminate their relationship – cannot insulate TLI's allegedly tortious conduct. Avaya's supposed bad acts and predatory conduct may end up supporting TLI's antitrust counterclaims, but the District Court provided no authority to suggest that those acts permitted TLI to engage in hacking or fraud in retaliation for its termination as a Business Partner.

A straightforward application of New Jersey's test for tortious interference with prospective economic advantage leads, we believe, to the conclusion that Avaya presented sufficient evidence from which a reasonable jury could conclude that TLI tortiously interfered with Avaya's prospective business advantage. Avaya had a reasonable

52

expectation of ongoing business with its own customers, who are the targets of TLI's sales efforts. As to the "malicious interference" element, we hold that a jury could reasonably have concluded that TLI's methods – including, as examples, its hacking, dishonest login requests, and use of proprietary information learned while an Avaya Business Partner – were fraudulent, dishonest, or otherwise contrary to the ethical standards of the industry. TLI presented no evidence that its actions were consistent with industry norms, and we would be loath to hold that there was no jury question here, even if it had. That leaves only the loss and causation element. The evidence could support a conclusion that TLI's interference resulted in Avaya losing direct maintenance contracts with customers. Moreover, even if customers independently terminated their direct service contracts with Avaya, if they had turned to other authorized maintenance methods instead of using TLI – whether using a Business Partner or self-maintaining – Avaya would still have profited because, as earlier noted, those methods also produced revenue for Avaya. Avaya thus presented sufficient evidence from which a jury could conclude that Avaya suffered damages, given that any money earned by TLI must have come from Avaya's pockets to at least some extent.

In sum, the District Court improperly made inferences in favor of the moving party, TLI, as to both contract interpretation and tortious interference with prospective economic advantage, and it failed to recognize the sufficiency of the evidence Avaya had adduced. If the jury had been allowed to draw its own inferences from the evidence, it may have agreed with the District Court that TLI's conduct was somehow permitted by Avaya's customer contracts. But the jury may very well have determined that TLI's actions were

53

not shielded by the customer contracts and were instead unethical, against the public interest, and ultimately tortious. We express no opinion on the correct answer in this dispute, holding only that the matter was for the jury to decide.

### 4.      Unfair Competition

Next, we consider Avaya's unfair competition claim. New Jersey law is not precise about what constitutes unfair competition.  But while "[t]he amorphous nature of unfair competition makes for an unevenly developed and difficult area of jurisprudence," at heart it "seeks to espouse some baseline level of business fairness." *Coast Cities Truck Sales, Inc. v. Navistar Int'l Transp. Co*., 912 F. Supp. 747, 786 (D.N.J. 1995) (interpreting New Jersey law) (citations omitted).[30]   New Jersey courts have deliberately kept the standard of liability somewhat adaptable, so that it may fit changing circumstances: "the purpose of the law regarding unfair competition is to promote higher ethical standards in the business world.  Accordingly, the concept is deemed as flexible and elastic as the evolving standards of commercial morality demand."  *Ryan v. Carmona Bolen Home for Funerals*, 775 A.2d 92, 95 (N.J. Super. Ct. App. Div. 2001) (internal quotation marks and citations omitted) (quoting *N.J.*

---

[30] Other business torts – including tortious interference – can themselves support an unfair competition claim.  *Coast Cities*, 912 F. Supp. at 786.  Our conclusion that the tortious interference claim should have proceeded to the jury is itself sufficient to overturn the judgment as a matter of law on the unfair competition claim.  Our analysis here focuses on those aspects of unfair competition that are distinct from tortious interference.

*Optometric Ass'n v. Hillman-Kohan,* 365 A.2d 956 (N.J. Super. Ct. Ch. Div. 1976)).

In New Jersey, unfair competition is commonly invoked for claims similar to misappropriation of trade secrets or commercial identity.  An unfair competition claim, however, protects more information than a traditional trade secret claim.  *See Torsiello v. Strobeck*, 955 F. Supp. 2d 300, 314 (D.N.J. 2013) ("Under New Jersey law, to be judicially protected, misappropriated information need not rise to the level of the usual trade secret, and indeed, may otherwise be publicly available." (quoting *Platinum Mgmt., Inc. v. Dahms*, 666 A.2d 1028, 1038 (N.J. Sup. Ct. Law Div. 1995))).  For example, in the *Lamorte* case, the Supreme Court of New Jersey reinstated summary judgment against the plaintiff's ex-employees who took their former employer's "client names, addresses, phone and fax numbers, file numbers, claim incident dates, claim contact information, and names of the injured persons."  770 A.2d at 1162.  The court endorsed the statement "that an agent must not take 'unfair advantage of his position in the use of information or things acquired by him because of his position as agent or because of the opportunities which his position affords.'"  *Id.* at 1167 (quoting Restatement (Second) of Agency § 387 cmt. b (1958)).  The court emphasized that "the [client-specific] information was available to defendants for their use in servicing clients on behalf of Lamorte only," and that "defendants also knew that Lamorte had an interest in protecting that information."  *Id.* at 1167.  Collectively, those facts established that the "information taken by defendants was confidential and proprietary information belonging to plaintiff."  *Id.* at 1168.

What constitutes misappropriation is somewhat vague. "It is not possible to formulate a comprehensive list of the conduct that constitutes 'improper' means of acquiring a trade secret." Restatement (Third) of Unfair Competition § 43 cmt c. (1995). Generally, however, "'[i]mproper' means ... include theft, fraud, unauthorized interception of communications, inducement of or knowing participation in a breach of confidence, and other means either wrongful in themselves or wrongful under the circumstances of the case." *Id*. § 43. Even a legitimate business purpose will not excuse otherwise tortious conduct if the means used are improper. *See Lamorte*, 770 A.2d at 1171. As another court has put it,

> [t]he key to determining the misuse of the information is the relationship of the parties at the time of disclosure, and its intended use. This tort tends to arise where an ex-employee uses confidential information to assist a competitor. A court may look to whether the information is public, whether it was provided in the course of employment for the sole purpose of servicing clients, how detailed the information is, and whether the party using the information is aware of the information holder's interest in protecting the information ... .

*Torsiello*, 955 F. Supp. 2d at 314 (internal quotation marks and citations omitted).

For a plaintiff to establish damages, New Jersey law allows recovery under a disgorgement theory in cases of unfair competition. *See Castrol, Inc. v. Pennzoil Quaker State Co.*, 169 F. Supp. 2d 332, 345-46 (D.N.J. 2001) (ruling

56

that the plaintiff in that case was "entitled to disgorgement of [the defendant's] profits" for its "claims under the New Jersey Common Law of Unfair Competition ... .").[31] Therefore, in place of proving specific damages, Avaya could properly seek disgorgement of TLI's profits from any conduct the jury found tortious.

We hold that Avaya presented sufficient evidence that a reasonable jury could have concluded that there was unfair competition under a misappropriation theory. The District Court's grant of judgment as a matter of law was thus erroneous. TLI gained access to proprietary information – namely ODMC login passwords – using hacking, the solicitation of disloyal former Avaya employees, and information learned during TLI's own time as an Avaya Business Partner. A jury could have determined that TLI's methods of gaining Avaya's proprietary information constituted misappropriation. Likewise, Avaya could show damages under either a lost profit theory or a disgorgement theory. Given that such a large proportion of TLI's well-accounted profits resulted from conduct that Avaya alleges was rooted in the misappropriation or proprietary information, the disgorgement theory may have been simple for the jury to apply to determine damages.

### 5. Fraud

---

[31] *See also* Restatement (Third) of Unfair Competition § 45 (1995) ("One who is liable to another for an appropriation of the other's trade secret ... is liable for the pecuniary loss to the other caused by the appropriation or for the actor's own pecuniary gain resulting from the appropriation, whichever is greater ... .").

57

We next consider Avaya's common law fraud claim. Under New Jersey law,

> proof of common law fraud requires the satisfaction of five elements: [1] a material misrepresentation by the defendant of a presently existing fact or past fact; [2] knowledge or belief by the defendant of its falsity; [3] an intent that the plaintiff rely on the statement; [4] reasonable reliance by the plaintiff; [5] and resulting damages to the plaintiff.

*Liberty Mut. Ins. Co. v. Land*, 892 A.2d 1240, 1247 (N.J. 2006). A jury must find fraud by clear and convincing evidence, a standard which demands "evidence so clear, direct and weighty and convincing as to enable the factfinder to come to a clear conviction, without hesitancy, of the precise facts in issue." *N.J. Div. of Youth & Family Servs. v. I.S.*, 996 A.2d 986, 1000 (N.J. 2010) (quoting *In re Seaman*, 627 A.2d 106, 100 (N.J. 1993)).Proof of damages can be supported by a jury inference that a defendant's actions "reduced the plaintiff's profits, although by an uncertain amount." *Nappe v. Anschelewitz, Barr, Ansell & Bonello*, 477 A.2d 1224, 1233 (N.J. 1984).

Based on the trial record, there was ample evidence from which a reasonable jury could have found for Avaya on the fraud claim. The evidence for the first element – fraudulent conduct – is straightforward. TLI had its customers fill out forms requesting login permissions but instructed those customers to leave the "Business Partner"

component of the form blank, to be filled in later by TLI.  TLI would then insert the name of an authorized Business Partner so that Avaya would provide the requested login information.  TLI therefore willfully misrepresented who was making the request for the login credentials and acknowledged the materiality of that misrepresentation by confirming that it did not want Avaya to find out what they were doing, because Avaya would otherwise not provide the logins.

The evidence also satisfies the second element, knowledge, in that it supports a conclusion that TLI knew it was operating under false pretenses.  The form at issue, by its very language, is a request from a customer to Avaya for delivery of information to a specifically named Business Partner.  The form provided that the login Avaya furnished would allow "the Business Partner listed above ... to perform additions, changes, moves and/or upgrades."  (J.A. 5313.) Yet TLI submitted the form knowing full well that the "Business Partner listed above" would not be performing those tasks, because TLI would be.

As to the third element, the reasonableness of relying on the representation, TLI filled out the form with the name and information of an existing, authorized Business Partner. A jury could find that Avaya acted reasonably by providing access information when it believed such access was being delivered to a provider with whom it had an existing contract.

The final element, damages, is what most concerned the District Court.  As established above, however, Avaya presented strong evidence – sufficient for the clear and convincing standard – that every dollar made by TLI in its maintenance of Avaya products was necessarily to some

59

degree at Avaya's expense. A jury could have reasonably concluded that each time TLI used a fraudulently obtained login to win or keep a maintenance contract, that cost Avaya profit. As the Supreme Court of New Jersey confirmed in *Nappe*, such an inference is enough to sustain a finding of damages, even where the exact amount may be uncertain. 477 A.2d at 1233.

Avaya thus presented sufficient evidence to send the fraud claim to the jury, based on TLI's deceptive login requests.

## 6. Breach of Contract

Finally, we turn to Avaya's breach of contract claims against TLI. As developed at trial, Avaya contended that TLI breached two contracts: the 1998 dealer agreement between Lucent and TLI, and the 2003 Avaya One agreement that was effective until TLI's participation as a Business Partner was terminated.[32] In both cases, the District Court did not contest the existence of the contract or damages, but instead granted judgment as a matter of law on the ground that "Avaya ha[d] failed to introduce evidence from which a reasonable jury could find that TLI breached either of the contracts." (J.A. 210.) Once again, there is not a sound basis for that holding.

### a. 1998 Dealer Agreement

The 1998 contract's choice of law provision provides that it is governed by Delaware law. In Delaware, the elements of a breach of contract claim are: "[1] the existence of the contract, whether express or implied; [2] the breach of an obligation imposed by that contract; and [3] the resultant damage to the plaintiff." *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).

---

[32] Whereas the customer contracts referenced above in Part II.A.2 were for PBX systems, the dealer agreements between Avaya and TLI are worded broadly enough to reach both the PBX and PDS markets. Insofar as Avaya's breach of contract allegations rely primarily on improper access to ODMCs and MSPs, however, the breach of contract claim is principally focused on the larger PBX market.

61

The signature page of the 1998 agreement evidences a contract between Lucent (Avaya's predecessor) and TLI (referred to in the contract as the "Dealer"), satisfying the first element of the cause of action. Section 2.8 of the 1998 agreement provides, in part, as follows:

> Dealer may not market or sell Lucent Products to any Lucent BCS Global Account, or … the United States Government, and *will use its best efforts to ensure that Dealer does not market to present direct customers of Lucent* who are under warranty or *with existing maintenance contracts* for Lucent products or to any entity that is *considering a proposal from Lucent for products or maintenance services*, except that Dealer may respond to a request for competitive bids, proposals, or quotations even if Lucent is also responding.

(J.A. 5905 (emphases added).)

Avaya claims that TLI breached that "best efforts" clause by marketing and selling maintenance services to existing Lucent/Avaya customers. At trial, Douglas Graham admitted that TLI "marketed … to existing Avaya maintenance customers" in 2001, while the firm "was operating under the terms of the 1998 Lucent dealer agreement." (J.A. 2704.) He also acknowledged a particular client to whom TLI had "marketed ... maintenance to replace existing Avaya maintenance." (J.A. 2705.)

In spite of what is arguably a clear violation of § 2.8 of the agreement, the District Court concluded that TLI's

62

conduct "does not constitute a breach" because the Court interpreted § 2.8 to prohibit only the marketing of "Lucent Products," a defined term that did not include maintenance. (J.A. 212.) That, however, is an overly cramped interpretation of the provision. Although a jury could perhaps import the "Lucent Products" language into the "best efforts" clause, that clause could just as easily support an interpretation that generally bars the marketing of maintenance to Lucent/Avaya customers. Indeed, the best efforts clause specifically prohibits marketing to Lucent/Avaya customers "with existing maintenance contracts ... or to any entity that is considering a proposal from Lucent for … maintenance services," which strongly suggests that maintenance was part of the prohibition. (J.A. 5905.) The District Court therefore erred in assuming that "no reasonable jury" could have found a breach of § 2.8. (J.A. 213.)

As to the final element, damages, we conclude that the same analysis for the earlier causes of action would have supported a jury finding that any profit that TLI gained by its breach of contract must have come, at least in part, at Avaya's expense. Therefore, we conclude that a jury could reasonably have found all three elements of a breach of contract, and judgment as a matter of law was not proper.

### b.     2003 Avaya One Agreement

The choice of law clause in the Avaya One agreement, § 18.1, provides that New York law governs. Under New York law, the elements of a breach of contract claim are similar to Delaware's: "[1] the existence of a contract, [2] the plaintiff's performance pursuant to the contract, [3] the

63

defendant's breach of his or her contractual obligations, and [4] damages resulting from the breach." *Neckles Builders, Inc. v. Turner*, 986 N.Y.S. 2d 494, 496 (N.Y. App. Div. 2014).

The signature page of the Avaya One agreement evidences a contract between Avaya and TLI, satisfying the first element. Section 7.3 of the Avaya One agreement provides, in part, as follows:

> [TLI] agrees not to reverse engineer, decompile or disassemble software furnished to it in object code form or permit any third party to do so. For any software included as part of the Licensed Materials which inherently includes the capability of being remotely enabled, [TLI] expressly agrees that it shall not enable, or permit or assist any third party to enable, such features or capabilities without Avaya's express written permission.[33]

(J.A. 6953.) That obligation was clearly intended to survive the termination of the Avaya One agreement.[34] Both an

---

[33] As an Avaya executive testified at trial, the purpose of that provision was "to protect [Avaya's] software assets going forward if there is information that a Business Partner gets, [and] also to make sure that nothing gets turned on subsequent[ to] termination." (J.A. 2116.)

[34] Section 17.6 of the agreement provided that "the termination of the Agreement shall not prejudice or otherwise affect ... any ... obligations of the parties, such as those arising

64

Avaya executive and a systems engineer testified that MSPs and the DADMIN logins were capable of being remotely enabled.

The agreement also included, at § 4.1, a general morality clause that bound TLI for the duration of the agreement:

> [TLI] shall: (a) conduct its business in a manner that reflects favorably on the Products and on the good name, goodwill and reputation of Avaya; (b) *avoid deception, misleading or unethical practices*; and (c) use *best efforts to promote, market, and further the interest of Avaya, its name and Products*.

(J.A. 6951 (emphases added).)

Although Avaya's performance – the second element of a breach of contract claim – was not part of the District Court's analysis, the record provides sufficient evidence for a jury to conclude that Avaya did perform. TLI was operating as a Business Partner under the Avaya One agreement from its execution until the business relationship between the parties was terminated. Douglas Graham acknowledged that the relationship was "mutually beneficial" and that, "[a]s an Avaya Business Partner ... TLI was authorized by Avaya to resell certain Avaya products and services." (J.A. 2699.)

---

under [Section 7], which by their nature continue beyond termination of the Agreement and which shall survive such termination." (J.A. 6959.)

Indeed, Avaya equipment was "by far [the] leading manufacturer product that [TLI] sold." (J.A. 2700.)

The District Court's analysis focused on the third element – the actual breach of a contractual obligation. Avaya's claim for breach of § 7.3 is straightforward. Insofar as MSPs and DADMINs were "licensed Materials which inherently include[d] the capability of being remotely enabled," a jury could find that TLI breached its contractual obligations when it "enable[d] ... or assist[ed] any third party to enable, such features or capabilities without Avaya's express written permission." (J.A. 6953.) Even though the District Court acknowledged that the meaning of those terms was "less than perfectly clear," it nonetheless concluded that the term "features and capabilities" unambiguously excluded MSPs and DADMIN logins. (J.A. 218-19.) Yet the activation of MSPs and use of DADMIN logins allowed customers to perform remote maintenance, for which customers were willing to pay additional licensing fees, suggesting that the customers considered them to be features or capabilities. Even if a reasonable jury could have agreed with the District Court's reading of the contract, there was at least sufficient ambiguity in the Avaya One agreement that the jury could have seen it the other way and agreed with Avaya that MSPs and DADMIN logins are "features and capabilities," the unauthorized activation of which by TLI amounted to a breach of contractual obligations.

As to the morality clause in § 4.1, Avaya contended that TLI breached its obligations when it began its allegedly unethical business practices during the term of the contract, in preparation for soliciting maintenance customers away from Avaya. Those activities included hacking logins and enlisting

66

Business Partners to obtain ODMC access. As early as May 2003, while still bound by the Avaya One agreement, TLI solicited Creswick to "pull ... password[s]." (J.A. 2281.) In September, during the contract term, TLI began to seek a "discreet Avaya Business Partner ... [to] submit DADMIN request forms on our behalf." (J.A. 5813.) A reasonable jury could have concluded that, by engaging Creswick and recruiting Business Partners to submit deceptive DADMIN login request forms, TLI was violating its contractual obligations to "avoid deception [and] misleading or unethical practices" and to "use best efforts to promote, market, and further the interest of Avaya." (J.A. 6951.)

Analysis of damages – the final element of the cause of action – was not central to the District Court's grant of judgment as a matter of law. However, the analysis for damages is as straightforward as for the tort claims, because PBX and PDS maintenance business gained by TLI as a result of its breach must have come, to some extent, at Avaya's expense.

## 7. Conclusion

Based on the foregoing analysis, we conclude that the District Court's grant of judgment as a matter of law was erroneous for the four affirmative common law claims that Avaya addresses in this appeal.[35] We will therefore vacate

---

[35] Although our dissenting colleague's "assessment of Avaya's case-in-chief is the same as the District Court's" (Dissenting Op. at 3-4), he has sufficient "doubt about the propriety of the District Court's decision" that he focuses his opinion on other issues (*id.* at 4). We therefore let our

the District Court's judgment and remand for further proceedings on those four claims. That does not, however, end our inquiry. Given the District Court's instruction to the jury that all of TLI's conduct was lawful, we must also consider whether the several errors associated with the District Court's handling of the common law claims also infected the remainder of the trial.

### B.    Prejudice on the Antitrust Verdict

Avaya, of course, argues that the error did spill over into the antitrust verdict. It presents three bases for concluding that the judgment as a matter of law prejudiced the jury's consideration of the antitrust counterclaims: first, it undermined Avaya's defense that its responses to TLI's conduct were reasonable and pro-competitive; second, it lent false credence to TLI's assertion that Avaya knew there was no truth to its letters (the so-called "FUD" letters described above) telling customers that using ISPs would be unlawful; and third, it led the District Court to wrongly restrict Avaya's cross-examinations of TLI witnesses. We agree that those problems, all resulting from the erroneous grant of judgment as a matter of law, did indeed likely affect the antitrust verdict.

### 1.    General Prejudice to Avaya's Antitrust Defense

All of the antitrust counterclaims against Avaya were presented under the "rule of reason," which gives effect to the

analysis of the District Court's error speak for itself as a response to that portion of the Dissent.

Supreme Court's instruction that the Sherman Act "only means to declare illegal any [restraint] which is in *unreasonable* restraint of trade." *United States v. Trans-Missouri Freight Ass'n*, 166 U.S. 290, 327 (1897) (emphasis added). "Under this rule, the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Cont'l T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49 (1977). Therefore, limitations on Avaya's ability to explain the reasonableness of its actions had the potential to harm its defense.

For the Sherman Act § 2 monopolization claims, for example, TLI had to establish that Avaya's allegedly predatory conduct was performed with monopolistic intent. "To prevail on an attempted monopolization claim under § 2 of the Sherman Act, a plaintiff must prove that the defendant (1) engaged in *predatory or anticompetitive conduct* with (2) *specific intent to monopolize* and with (3) a dangerous probability of achieving monopoly power." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 442 (3d Cir. 1997) (emphasis added) (internal quotation marks omitted). "Liability turns ... on whether valid business reasons can explain [a defendant's] actions." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 483 (1992) (internal quotation marks omitted). As the District Court instructed the jury, "acts or practices that result in the acquisition or maintenance of monopoly power must represent something more than the conduct of business that is part of the normal competitive process" and must be actions that are "taken for no legitimate business reasons." (J.A. 621.) Insofar as Avaya was limited in explaining why its

actions were not predatory or lacked a monopolistic intent, those limitations would of course harm its defense.[36]

The District Court's instructions in light of its erroneous Rule 50 decision on the common law claims may well have affected the jury's assessment of the reasonableness and purpose of Avaya's actions. The jury was prevented from deciding the antitrust claims and the common law claims in concert and from evaluating whether TLI's allegedly tortious conduct provided a legitimate business justification for the things Avaya's did. Specifically, the Court instructed the jury that

> Avaya's claim[s] against TLI[] ... have been resolved and are no longer before you. ...

> In Avaya's direct claims against all the defendants, Avaya asserted that [TLI's] use of

---

[36] Moreover, as we explain in more detail below, under the specific theory of antitrust liability pressed by TLI, if Avaya's sales contracts had established that using independent service providers was prohibited, then any remedy to infirmities in that arrangement would lie "in contract, not under the antitrust laws." *Queen City Pizza*, 124 F.3d at 441. Therefore, to the extent that Avaya's interpretation of its customer contracts was correct, that would have added a very potent weapon to Avaya's arsenal to combat the specific theory of antitrust liability argued by TLI. But Avaya was precluded from making that argument because the District Court erroneously adopted a definitive construction of those contracts, as a matter of law, in service of its Rule 50 decision.

70

and access to the maintenance software embedded in the Avaya PBXs and PDSs, such as the on-demand maintenance commands, was, for a variety of reasons, unlawful. I now instruct you that [*TLI's*] *use of and access to such maintenance software may not be considered by you as unlawful when deciding* [*TLI's*] *claims against Avaya asserted in the counterclaim.* To the extent Avaya has alleged that TLI[] engaged in illegal or unlawful conduct, in connection with its business operations, such allegations should be disregarded.

(J.A. 4739 (emphasis added).)

Not only did the District Court so instruct the jury, but TLI itself repeatedly emphasized that instruction in its closing argument in order to undercut Avaya's defense that there was a reasonable business justification for its actions. Consider this passage from TLI's summation:

When TLI started to compete with Avaya, it had the right to do so; and, yes, [the District Court] will instruct you tomorrow, you should not consider TLI's ... use of and access to the maintenance software that's embedded in these Avaya PBX systems and dialers, do not consider it in any way unlawful. And this is critically important for you to understand. You are not to consider TLI's actions in that regard unlawful.

71

(J.A. 4732.)[37]

The District Court's erroneous instruction, combined with TLI's repeated hammering of the point, highlights how important the lawfulness or unlawfulness of TLI's actions could have been to the jury's deliberations. Avaya's entire affirmative case alleged that TLI's conduct was tortious and in breach of contractual obligations. If true, Avaya's defensive response could be seen as substantially more reasonable, and its intentions substantially less predatory. By instructing the jury that it could not consider TLI's conduct to be unlawful – an instruction premised on the flawed grant of judgment as a matter of law – the District Court improperly prevented the jury from weighing Avaya's defenses in light of the rule of reason standard for both the § 1 and § 2 Sherman Act claims.[38]

_____

[37] At least twice more, TLI strongly emphasized the importance of the District Court's jury instructions. For instance, it told the jury that "[w]hen TLI started to compete with Avaya, it had every right to do so. TLI's use and access to maintenance software that's embedded in these systems, you should not consider to be unlawful. You will hear that instruction from the judge tomorrow." (J.A. 4733.) Later, it reminded the jury: "Again, you will be instructed by the Court tomorrow, that you are not to consider TLI's access to or use of the maintenance software, including MSPs and ODMs, called ODMCs and maintenance software permissions, as in any way unlawful use of that maintenance software." (J.A. 4734.)

[38] As we read the Dissent, its objection to our conclusion comes down to its premise that "Avaya had ample

72

opportunity to present the jury with legitimate and procompetitive defenses for its actions." (Dissenting Op. at 10.) To be sure, Avaya mounted a vigorous defense notwithstanding the limitations it faced as a result of the Rule 50 ruling, but we lack the Dissent's confidence that it is "highly probable that the error did not affect the outcome of the case." *Glass v. Phila. Elec. Co.*, 34 F.3d 188, 191 (3d Cir. 1994) (quotation marks and citation omitted). A jury may well have evaluated Avaya's conduct differently if Avaya were simply enforcing its contractual rights or combating tortious activity, as TLI itself recognized by its repeated emphasis in its summation that its actions could not be considered unlawful. The Dissent betrays the importance of the lawfulness determination when it says that Avaya's "defenses did not depend on whether TLI's conduct was so egregious as to be *against the law*." (*Id.*) The special egregiousness of unlawful conduct is precisely the argument that Avaya wanted to make – and was deprived from making – to the jury.

This is also where the Dissent's "David and Goliath" analogy breaks down. Avaya was certainly the bigger competitor, but TLI was no plucky little company armed only with the business equivalent of a sling and a few stones. It was a sophisticated and aggressive company, which, at least according to Avaya and a great deal of the evidence at trial, was prepared to, and did, engage in what even the Dissent acknowledges were "deceitful and/or unethical" business methods. (*Id.* at 2.) Since those methods were such that the jury could have found them unlawful, the Rule 50 error was not harmless.

### 2. "Fear, Uncertainty, and Doubt" Letters

Beyond the general infection of the jury's consideration of the reasonableness of Avaya's actions, the District Court's grant of judgment as a matter of law also undercut a specific portion of Avaya's antitrust defense.

Among the evidence put forward by TLI to prove predatory conduct were the FUD letters. Those letters told customers that MSPs "are not available to customers of Unauthorized Service Providers," that "Unauthorized Maintenance Service Providers do not have rights to receive [MSP] benefits, nor do they have rights to use Avaya logins," and that "[u]se of MSPs, or any Avaya Login ... without a license from Avaya, is an infringement of Avaya's intellectual property rights." (J.A. 7303-04.)

Whether those letters could constitute monopolistic conduct turned on whether they were true. As the District Court instructed the jury, "the law does not allow [TLI's] injury to be based on ... Avaya's dissemination of truthful statements." (J.A. 621.) The jury's assessment of the letters' truthfulness was surely influenced by the District Court's instruction that TLI's "use of and access to such maintenance software may not be considered by you as unlawful" and that "[t]o the extent Avaya has alleged that TLI[] engaged in illegal or unlawful conduct, in connection with its business operations, such allegations should be disregarded." (J.A. 615.)

That instruction all but told the jury that the letters were false in their allegation that TLI's access was unlawful.

TLI's trial counsel then connected those closely adjacent dots when he took advantage of the instruction to argue to the jury that Avaya's FUD letters were untruthful and therefore monopolistic:

> Even though it acknowledged that it had no legal basis to do so,[39] Avaya sent FUD letters to TLI's customers ... .

> As the Court will instruct you tomorrow, you are not to consider ... TLI's access to the maintenance commands or the maintenance software as unlawful, but Avaya's FUD campaign simply did not convey truthful information.

(J.A. 4736.)[40]

---

[39] We have been shown nothing in the record suggesting that Avaya acknowledged that it had "no legal basis" to send the so-called FUD letters. To the contrary, Avaya's entire affirmative case relied in large part on a belief that TLI's unauthorized provision of maintenance services did lead customers to breach their contracts with Avaya. On appeal, Avaya continues to argue that the FUD letters were truthful.

[40] The Dissent contends that "[e]ven if the jury had not been instructed that unauthorized access to Avaya software was not illegal, it is unlikely that it would have reached a different verdict." (Dissenting Op. at 13.) The Dissent says that Avaya seemed to concede that the FUD letters included some "over-the-top" prose (*id.*), but be that as it may, the

75

### 3. Interference with Defense and Cross-Examination

Avaya also contends that the District Court's grant of judgment as a matter of law hindered its ability to present evidence in its defense against the antitrust claims. It points to two examples in particular.

First, during Avaya's cross-examination of TLI's CEO, Avaya's counsel asked about how TLI got access to Avaya brand PBX systems. At a sidebar, the District Court told counsel that, "[i]f you're trying to tell the jury they're illegal, I have a problem with that." (J.A. 4440.) The Court did allow the line of questions but under the restriction that counsel could not imply that TLI's actions were unlawful.

Second, when Avaya was examining its own economics expert, it presented evidence that restrictions it placed on its Business Partners actually ended up "clearing the field" in a way that advantaged TLI competitively.[41]

---

degree to which those letters were legitimate surely depended on the truth of the legal assertions in them. If Avaya was correct in its assertions that unauthorized access was unlawful – a question taken away from the jury by virtue of the Rule 50 decision – then the letters arguably contain defensible statements of law. That could make a world of difference to a jury in evaluating the truthfulness and competitive legitimacy of the letters.

[41] The basis for the field-clearing argument was that because Avaya restricted its Business Partners from competing with it for maintenance business, when TLI sought

Before the Rule 50 decision, the expert was planning to include analysis predicated on the illegality of TLI's conduct, but – after the judgment as a matter of law – the District Court reminded counsel in a sidebar to "[s]tay away from trying to ... contradict anything I've already decided," in reference to the Rule 50 decision. (J.A. 4587.)

Those specific examples speak to a broader point. They highlight that, if Avaya had been able to argue that TLI's conduct was unlawful, that argument would likely have been a key and repeated part of its defense to the antitrust claims. Each argument by TLI's counsel to the contrary could have been met with a forceful response. Avaya's claim that it was "hamstrung in its ability to justify its supposedly anticompetitive conduct" is therefore a fair and accurate one. (Third Step Br. at 19.)[42]

---

to lure customers from Avaya, it did not have to compete with any of those Business Partners, who were precluded from seeking that business. In that way, the expert opined, TLI benefited from much of the allegedly anticompetitive conduct over which it filed suit because that conduct restricted TLI's competition as much as it did Avaya's.

[42] The Dissent suggests that any limitations placed on Avaya's defense as a result of the Rule 50 ruling were merely "rhetorical," and that being able to argue the illegality of TLI's conduct "would not have changed the substance of Avaya's procompetitive-justification argument." (Dissenting Op. at 12.) We disagree. It is one thing to explain to a jury that sharp-elbowed tactics were taken to retaliate against aggressive but completely lawful activities of a competitor. It is altogether different to be able to argue that the restraints of

### 4.    Harmless Error Analysis

Having concluded that the judgment as a matter of law on Avaya's common law claims was an error, and that that error likely affected the jury's consideration of the antitrust claims, we must now consider whether that effect was harmless. "An error will be deemed harmless only if it is highly probable that the error did not affect the outcome of the case," and, in that same vein, an error cannot be said to be harmless unless there is a high probability "that the result would have been the same had the jury been correctly instructed." *Hill v. Reederei F. Laeisz G.M.B.H., Rostock*, 435 F.3d 404, 411 (3d Cir. 2006) (internal quotation marks omitted). We have held, when interpreting this "highly probable" standard, that an error is not harmless if it could have "reasonably ... affected the outcome of the trial," *id.* at 411, or if the jury "quite possibly" relied on an erroneous instruction, *see Hirst v. Inverness Hotel Corp.*, 544 F.3d 221, 228 (3d Cir. 2008).

In this case, we cannot say that it was "highly probable" that the District Court's erroneous Rule 50 decision and resulting erroneous jury instruction about the lawfulness of TLI's conduct did not affect the outcome of the antitrust claims.[43] On the contrary: we think it probable that they did

---

trade at issue were necessary to enforce Avaya's contractual rights and to deter fraudulent and tortious interference with Avaya's legitimate business interests.

[43] The Dissent would not even reach the question of whether the District Court's erroneous Rule 50 order infected the antitrust verdict, on the ground that Avaya forfeited any

affect the outcome. The judgment as a matter of law, the concordant limitations on Avaya's antitrust defense, and the ultimate jury instruction about lawfulness all seriously hampered Avaya's ability to argue that its conduct was a

---

argument of spill-over prejudice. That position seems to us to result from the Dissent's separate (and, in our estimation, incorrect) view that any prejudicial effect on the jury's consideration of the antitrust counterclaims was tangential and minor. We agree with our dissenting colleague that, "[i]f a claim of error is unaccompanied by developed argument, it is forfeited." (Dissenting Op. at 6 (internal quotation marks and citation omitted).) In this case, however, the claim of error – that the District Court's Rule 50 decision was improper – was indisputably fully briefed and argued. Avaya's position that the erroneous Rule 50 ruling tainted the antitrust verdict was made as a request for a particular form of relief to correct that error. The request was brief but the brevity is unsurprising, given how inextricably linked Avaya's rule of reason antitrust defense was to its claims that TLI's actions were unlawful. Avaya could reasonably have expected TLI's answer simply to contest Avaya's claim of error as to the Rule 50 ruling, as TLI in fact did contest at length. As it happened, however, TLI also raised a separate argument, as an alternative basis to affirm, that any error was harmless as to the antitrust verdict. Avaya then provided a rebuttal to that assertion of harmlessness with exactly the kind of responsive argumentation we would expect in a reply brief. *Cf. Becker v. ARCO Chem. Co.*, 207 F.3d 176, 205 (3d Cir. 2000) (considering and rejecting a harmless error argument raised for the first time by the appellee at oral argument and only then countered by the appellant).

justifiable and reasonable response to TLI's underhanded methods of acquiring Avaya's proprietary business information. That TLI used the District Court's errors to pound home its own case only compounded the problem and further undermines our confidence in the verdict. Because the errors "quite possibly" affected the judgment, we must vacate it. *Hirst*, 544 F.3d at 228.[44]

## C.  Antitrust Issues

Avaya does not simply seek vacatur, however. It argues that we should reverse the judgment and hold that it is entitled to judgment on the antitrust counterclaims because TLI adduced insufficient evidence to support them. We begin our analysis of that argument by reviewing how the antitrust laws treat product tying. We then turn to Avaya's claim-specific contentions and conclude that the PBX attempted monopolization counterclaim is legally invalid for PBXs sold after 2008 and that the PDS tying counterclaim must fail as a matter of law.

### 1.  Tying in Antitrust Law

TLI's antitrust counterclaims against Avaya are based on an allegedly unlawful use of tying to restrain and monopolize the market for PBX and PDS maintenance services. "[A] tying arrangement may be defined as an agreement by a party to sell one product [or service] but only

---

[44] The parties also dispute the propriety of the injunctive relief ordered by the District Court. Because we will vacate the verdict and judgment of liability, we must also vacate the resulting injunction.

on the condition that the buyer also purchases a different (or tied) product [or service], or at least agrees that he will not purchase that product [or service] from any other supplier." *Northern Pacific Ry. Co. v. United States*, 356 U.S. 1, 5-6 (1958). For a pair of products or services to be distinct, and therefore capable of being tied together, "there must be sufficient consumer demand so that it is efficient for a firm to provide [them] separately." *Kodak*, 504 U.S. at 462. Tying can support a Sherman Act claim either under § 1, as an unlawful restraint on trade, or under § 2, as an unlawful act of monopolization or attempted monopolization. *See* Phillip E. Areeda & Herbert Hovenkamp, *Fundamentals of Antitrust Law* ("*Fundamentals*") § 17.01, at 17-13 (4th ed. Supp. 2015); *see also* 15 U.S.C. §§ 1-2.[45] Under the antitrust theories presented by TLI, Avaya unlawfully tied its PBX and PDS systems to maintenance services by conditioning access to equipment and software on the purchase of such services from Avaya or its Business Partners.

Not all ties are illegal, however. To declare otherwise would risk making practically every product the subject of an antitrust suit, because, in theory at least, most any product can be deconstructed into component parts that could be sold separately. For that reason, "[i]t is clear ... that every refusal to sell two products separately cannot be said to restrain

---

[45] TLI secured verdicts against Avaya under both §§ 1 and 2 of the Sherman Act. Section 1 declares illegal "[e]very contract, combination ..., or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. Section 2 makes unlawful any act to "monopolize, or attempt to monopolize, or combine or conspire ... to monopolize any part of the trade or commerce." 15 U.S.C. § 2.

81

competition." *Jefferson Par. Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 11 (1984) *partially abrogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 544 U.S. 28 (2006). Instead,

> the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms. When such "forcing" is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated.

*Id.* at 12. Therefore, "[w]hen ... the seller does not have ... the kind of market power that enables him to force customers to purchase a second, unwanted product in order to obtain the tying product, an antitrust violation can be established only by evidence of an unreasonable restraint on competition in the relevant market." *Id.* at 17-18.

In this case, nobody contends that the primary market for PBX and PDS systems is anything other than competitive, or that Avaya's main competitors in that market – large firms such as Cisco, Siemens, and Microsoft – cannot use prices to discipline Avaya in that primary market. As to the primary market, then, TLI's position is not that Avaya's "share of the market is high" or that it "offers a unique product that competitors are not able to offer." *Id.* at 17. Rather, TLI has proceeded under a specialized theory of tying developed in a Supreme Court case called *Eastman Kodak Company v.*

82

*Image Technical Services, Inc.*, 504 U.S. 451 (1992). Review of the *Kodak* opinion and our Court's elaboration of its principles is essential, then, because TLI's counterclaims rise or fall based on whether they comport with a *Kodak* theory of antitrust liability.

### a. The *Kodak* Theory of Antitrust Tying Liability

*Kodak* presented the Supreme Court with a situation similar to the one before us, consisting of a primary market for complex durable goods and an aftermarket for maintenance service. Kodak sold photocopier equipment, as well as maintenance service and replacement parts. *Id.* at 455. The parts were of proprietary design and were not interchangeable with other manufacturers' parts. *Id.* at 456-57. Kodak sold both parts and service, using different contract arrangements to charge different prices to different customers. *Id.* at 457. When Kodak attempted to prevent the sale of its parts to independent maintenance service providers – thereby restricting their ability to service Kodak machines – a group of those independent providers filed suit, alleging unlawful tying of parts and service in violation of §§ 1 and 2 of the Sherman Act. *Id.* at 458-59.

On ultimate appeal from the district court's grant of summary judgment for Kodak, the Supreme Court ruled that the plaintiffs had put forward a strong enough case to proceed to trial. The Court accepted Kodak's argument that the primary equipment market was competitive, *id.* at 465 n.10, but it nonetheless ruled that the plaintiffs could proceed under a § 1 tying theory of antitrust liability. It refused to endorse Kodak's assertion that competition in the primary market

would necessarily discipline the maintenance aftermarket, preferring not to adopt "[l]egal presumptions that rest on formalistic distinctions rather than actual market realities." *Id.* at 466. Instead, the Court insisted on a context-specific factual analysis of whether "the equipment market does discipline the aftermarkets so that [both] are priced competitively overall, or that any anti-competitive effects of Kodak's behavior are outweighed by its competitive effects." *Id.* at 486. "The fact that the equipment market imposes a restraint on prices in the aftermarkets" does not, on its own, "disprove[] the existence of power in those markets." *Id.* at 471 (citation omitted).

In explaining how a seller facing a competitive primary equipment market could nonetheless exercise market power in the parts and maintenance aftermarkets, the Court expounded a theory whereby high information and switching costs would allow the seller to exploit customers who had already purchased the equipment and were then "locked in" to the aftermarkets. *Id.* at 476. It explained that "[l]ifecycle pricing of complex, durable equipment is difficult and costly," and that the information needed for such lifecycle pricing "is difficult – some of it impossible – to acquire at the time of purchase." *Id.* at 473. Because "[a]cquiring the information is expensive[, i]f the costs of service are small relative to the equipment price, ... [consumers] may not find it cost efficient to compile the information." *Id.* at 474-75. Additionally, competitors may not provide that information, either because they do not have it themselves or because they may wish to collusively engage in the same behavior with their own customers so that "their interests would [not] be advanced by providing such information to consumers." *Id.*

at 474 & n.21 (citation omitted). Customers' information limitations could be paired with high switching costs so that

> consumers who already have purchased the equipment, and are thus "locked in," will tolerate some level of service-price increases before changing equipment brands. Under this scenario, a seller profitably could maintain supracompetitive prices in the aftermarket if the switching costs were high relative to the increase in service prices, and the number of locked-in customers were high relative to the number of new purchasers.

*Id.* at 476. In other words, tying liability may exist in an aftermarket where the seller can exploit customers who have already purchased the equipment and cannot easily shift to another brand.

The Supreme Court also posited that the threat of anticompetitive exploitation of aftermarkets in light of high information and switching costs would be particularly severe in cases where the seller could engage in price discrimination, *i.e.*, charging different prices to different types of consumers. With respect to information costs, "if a company is able to price discriminate between sophisticated and unsophisticated consumers, the sophisticated will be unable to prevent the exploitation of the uninformed." *Id.* at 475. With respect to switching costs, "if the seller can price discriminate between its locked-in customers and potential new customers," it can exploit locked-in customers with supracompetitive aftermarket prices while simultaneously charging low prices to new customers. *Id.* at 476. Those forms of price

discrimination could allow a savvy monopolistic seller to create a market tiered like a pyramid. While charging lower lifecycle prices to sophisticated customers in the primary market, the seller could dupe low-information customers into paying a deceptively low upfront cost for the equipment, to lock them in due to high switching costs and set them up for supracompetitive prices in the aftermarkets for parts and service. In the meantime, it could continue to make a normal competitive profit from sales to sophisticated new customers by charging them lower lifecycle prices through lower-priced long-term contracts. Price discrimination thus allows a seller to run a multi-tier market dividing more sophisticated consumers from less sophisticated ones, while lock-in snares the unsophisticated customers once the proverbial trap has been sprung.

Not only was that theory sufficient to support § 1 liability, the Court also held that it could support § 2 liability for unlawful monopolization. In that analysis, the Court incorporated the § 1 analysis for whether the equipment market and the service and parts aftermarkets were distinct for antitrust purposes. *Id.* at 481. It was comfortable with defining a single-brand market as relevant for antitrust purposes as long as such a market was justified by "the choices available to ... equipment owners," as "determined ... after a factual inquiry into the 'commercial realities' faced by consumers." *Id.* at 482 (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 572 (1966)). A successful plaintiff had to prove more, however, to succeed on a § 2 claim, because simply proving monopoly power in the aftermarket was not enough. A § 2 claim additionally requires showing the use of that monopoly power "to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *Id.* at

482-83 (quoting *United States v. Griffith*, 334 U.S. 100, 107 (1948)). Therefore, in defending against a § 2 claim, the seller has the opportunity to justify its actions so that "[l]iability turns ... on whether 'valid business reasons' can explain [its] actions." *Id.* at 483 (quoting *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 (1985)). The Court was willing to consider as valid business reasons both controlling inventory costs and ensuring high quality maintenance service, but it did not consider the record in *Kodak* as sufficient to warrant summary judgment. *Id.* at 483-86.

### b. Third Circuit Elaboration of *Kodak*

Since *Kodak*, our Court has had the opportunity to develop that case's theory of antitrust liability, most notably in a pair of cases called *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir. 1997), and *Harrison Aire, Inc. v. Aerostar International, Inc.*, 423 F.3d 374 (3d Cir. 2005).

In *Queen City Pizza*, we considered a *Kodak*-style claim by a group of franchisees against Domino's Pizza, alleging that Domino's had used its monopoly power over the market for franchise rights and proprietary pizza dough to restrain trade in the market for approved pizza supplies. 124 F.3d at 434. We affirmed the district court's dismissal of the claims under Federal Rule of Civil Procedure 12(b)(6) because we did not consider the contractual requirement for franchisees to purchase pizza ingredients from Domino's to implicate the concerns raised in *Kodak*. *Id*. at 444. We observed "that Domino's approved supplies and ingredients

are fully interchangeable in all relevant respects with other pizza supplies" so that they were not unique in the way that Kodak parts were. *Id.* at 440. The plaintiffs were not, therefore, forced to purchase approved supplies because of the uniqueness of any Domino's goods, but instead only "because they [were] bound by contract to do so." *Id.* at 441. In distinguishing that contractual obligation from the *Kodak* situation, we explained that, where the defendant's forcing power "stems not from the market, but from plaintiffs' contractual agreement ..., no claim will lie."[46] *Id.* at 443. "If

---

[46] In *Queen City Pizza*, we talked, in part, of the defendant forcing "plaintiffs to purchase the ... *tying* product." 124 F.3d at 443 (emphasis added). That language was a result of the idiosyncratic nature of one of the tying theories alleged in that case. Under that theory, the primary market was for restaurant franchise agreements, which in turn contractually bound franchisees to purchase the alleged "tying" product, fresh dough. The franchisees contended that Domino's "refused to sell fresh dough to [them] unless [they] purchased other ingredients and supplies from Domino's," *id.* at 434, so that the "other ingredients and supplies" were the "tied" product.

The analogy here would be an argument that the primary market was for PBX systems, which "forced" the purchase of ODMCs and MSPs as the "tying" products, which were in turn allegedly used to force purchase of maintenance as the "tied" service. No matter how many intermediate steps are alleged, however, in the end our concern is whether the defendant forced purchases of a tied product using power in some distinct market. *Jefferson Parish*, 466 U.S. at 12. *Queen City Pizza* stands for the proposition that if the supposed forcing is entirely the result

Domino's ... acted unreasonably when ... it restricted plaintiffs' ability to purchase supplies from other sources, plaintiffs' remedy, if any, is in contract, not under the antitrust laws." *Id.* at 441.

We also emphasized in *Queen City Pizza* that "[t]he *Kodak* case arose out of concerns about unilateral changes in Kodak's parts and repairs policies." *Id.* at 440. Because Kodak's change in policy against independent maintenance providers "was not foreseen at the time of sale, buyers had no ability to calculate these higher costs at the time of purchase and incorporate them into their purchase decision." *Id.* The Domino's franchisees, on the other hand, "knew that Domino's Pizza retained significant power over their ability to purchase cheaper supplies from alternative sources because that authority was spelled out in ... the ... franchise agreement," so the "franchisees could assess the potential costs and economic risks at the time they signed the franchise agreement." *Id.* If the franchisees found the contractual requirements "overly burdensome or risky at the time they were proposed, [they] could have purchased a different form of restaurant, or made some alternative investment," *id.* at 441, so that the transaction was "subjected to competition at the pre-contract stage," *id.* at 440. We thus characterized *Kodak* as concerned largely with the threat of unfair surprise for customers in the aftermarket, a threat ameliorated if the aftermarket terms were made clear in a primary market contract.

---

of a transparent contractual agreement, then that is not the concern of the antitrust laws. A plaintiff cannot avoid that outcome merely by crafting a complaint to allege intermediate steps.

In *Harrison Aire*, our Court's second major case elaborating *Kodak*, we affirmed summary judgment against the *Kodak*-style claims of a hot air balloon operator that alleged that the balloon manufacturer had monopolized the aftermarket for replacement balloon fabric by tying the purchase of its own branded fabric to its balloons. 423 F.3d at 379, 386. We explained that, in general, "[i]f the primary market is competitive, a firm exploiting its aftermarket customers ordinarily is engaged in a short-run game – for when buyers evaluate the 'lifecycle' cost of the product, the cost of the product over its full service life, they will shop elsewhere." *Id.* at 382. The *Kodak* case is an exception to that general rule, based on a "market failure" in which "lifecycle pricing information is particularly difficult or impossible for primary market customers to acquire, as in the case of a unilateral change in aftermarket policy targeting 'locked in' customers." *Id.* We emphasized that "*Kodak* does not transform every firm with a dominant share of the relevant aftermarket into a monopolist," and that a *Kodak*-style "plaintiff must produce 'hard evidence dissociating the competitive situation in the aftermarket from activities occurring in the primary market.'" *Id.* at 383 (quoting *SMS Sys. Maint. Servs., Inc. v. Digital Equip. Corp.*, 188 F.3d 11, 17 (1st Cir. 1999)).

In evaluating the evidence in *Harrison Aire*, we cautioned that, although "[o]ne important consideration is whether a unilateral change in aftermarket policy exploits locked-in customers," *id.* at 383, "an 'aftermarket policy change' is not the *sine qua non* of a *Kodak* claim," *id.* at 384. Other factors to consider include "evidence of (1) supracompetitive pricing, (2) [the seller's] dominant share of the relevant aftermarket, (3) significant information costs that

90

prevent[] lifecycle pricing, and (4) high 'switching costs' that serve[] to 'lock in' [the seller's] aftermarket customers." *Id.* Applying those factors to the specific circumstances of the *Harrison Aire* case, we concluded that "[n]either information costs nor a unilateral change in aftermarket policy prevented [the plaintiff] from shopping for competitive lifecycle balloon prices when it purchased the ... balloon at issue." *Id.* at 384-85. Without "other evidence dissociating competitive conditions in the primary balloon market from conditions in the aftermarket for replacement fabric," it was "clear that [the plaintiff] got precisely the balloon and the aftermarket fabric that it bargained for in the competitive primary market." *Id.* at 385. Therefore, summary judgment against the monopolization claim was appropriate.[47]

### c.     Synthesizing the *Kodak* Case Law

*Kodak* makes clear that, in certain limited circumstances, a competitive primary market will not insulate a defendant from antitrust liability. But neither that case nor our subsequent case law overturns the more general principle that a plaintiff's theory of antitrust liability must be economically plausible. Thus, in the summary judgment context, "'antitrust law limits the range of permissible

---

[47] We also affirmed summary judgment against the § 1 tying claim raised in *Harrison Aire* because "[t]ying requires appreciable economic power in the tying product market," and the plaintiff "fail[ed] to produce any evidence of appreciable market power in the tying product market" for hot air balloons. 423 F.3d at 385 (citations and internal quotation marks omitted).

inferences' that can be drawn 'from ambiguous evidence.'" *Harrison Aire*, 423 F.3d at 380 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986)).

That "higher threshold" for summary judgment "is imposed in antitrust cases to avoid deterring innocent conduct that reflects enhanced, rather than restrained, competition." *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 357 (3d Cir. 2004). As the Supreme Court put it plainly in *Kodak* itself, "[i]f [a] plaintiff's theory is economically senseless, no reasonable jury could find in its favor, and summary judgment should be granted." 504 U.S. at 468-69. The requirement that a plaintiff make out an economically coherent theory of antitrust liability applies just as much to the pleading stage, where, to "make a § 1 claim," a plaintiff must "identify[] facts that are suggestive enough to render a § 1 [violation] plausible," with sufficient "context" to "raise[] a suggestion" of unlawful anticompetitive conduct. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556-57 (2007). The requirement that a plaintiff provide an economically plausible theory for its antitrust claims applies no less at trial than when a case is resolved by summary judgment or on the pleadings.

With that in mind, we do not read – and have never read – *Kodak* to modify the requirement that a plaintiff in a tying case prove that the defendant has market power sufficient "to force a purchaser to do something that he would not do in a competitive market." *Jefferson Parish*, 466 U.S. at 14. In general, we expect a vibrant and competitive primary market to discipline and restrain power in related aftermarkets. What *Kodak* stands for is the principle that there can be some exceptions to that expectation, when a plaintiff can produce a plausible economic theory of market

92

failure, supported by sufficient evidence. In evaluating the issues in this case, we must consider just how broadly that *Kodak* exception should be read.

A leading antitrust treatise seems to suggest that *Kodak* should be read as confined to the lock-in situation that was that opinion's focus. As that treatise distills the *Kodak* analysis: "Kodak could exploit locked-in customers with supracompetitive prices only if it could profitably (1) dispense with sophisticated new customers or (2) could discriminatorily overcharge only those existing customers whose exploitation would not affect new sales." Areeda & Hovenkamp, *Fundamentals*, *supra*, § 5.12, at 5-102 (Supp. 2016).[48] Those conditions will rarely obtain, and "[m]uch

---

[48] As that treatise explains those two elements in greater detail:

> when a defendant has no power in the [primary] market, it cannot profitably charge supracompetitive prices for unique [aftermarket products] to "locked in" users unless:
>
> 1. it can profitably abandon selling new machines to sophisticated new customers who would understand that the machine's cost is the sum of its nominal price plus the excess [maintenance] charges later ...; *or*
> 2. it can price discriminate by identifying and overcharging only unsophisticated users and thus assuring competitive ... prices for new, sophisticated customers.

more typically, high aftermarket prices are explained as an offset to more intense competition in the foremarket good." *Id.* at 5-103. In that scholarly view, then, *Kodak* identified a pair of possible conditions in which primary market competition will not discipline aftermarket prices, but it should not be read as embracing any broader economic theory of tying liability.

We have not read *Kodak* quite so narrowly. The Supreme Court emphasized that "[l]egal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law" and that

---

> Unless one of these conditions is satisfied, the defendant without power in the [primary] market also lacks the power to charge supracompetitive prices for unique [aftermarket products].

Areeda & Hovenkamp, *Fundamentals*, *supra*, § 5.12, at 5-102 to 103.

In a companion treatise, those scholars suggest going even further to limit the reach of *Kodak* in circumstances of competitive primary markets:

> *Kodak* does not foreclose a rebuttable presumption that lack of power in the relevant primary market (such as equipment) implies a lack of substantial power in derivative markets (such as parts or service). Indeed, *Kodak* may even allow a conclusive presumption to this effect in order to simplify administration of the antitrust laws.

Phillip E. Areeda & Herbert Hovenkamp, 10 *Antitrust Law* ¶ 1740, at 133 (3d ed. 2011).

antitrust claims should be resolved "on a case-by-case basis, focusing on the particular facts disclosed by the record." *Kodak*, 504 U.S. at 466-67 (citations and internal quotation marks omitted) (quoting *Maple Flooring Mfrs. Ass'n v. United States*, 268 U.S. 563, 579 (1925)). In *Harrison Aire*, we declined to read *Kodak* as applying narrowly to only cases involving "[a]n aftermarket policy change," because *Kodak* mandated that courts look at "several relevant factors." *Harrison Aire*, 423 F.3d at 384. The test is more broad: a plaintiff pursuing a *Kodak*-style claim must present evidence to support a plausible economic explanation that competition in the primary market is "dissociat[ed] ... from conditions in the aftermarket." *Id.*

Showing exploitation of locked-in customers, as detailed in *Kodak*, is one way to satisfy that burden, but our own case law prevents us from concluding in the abstract that it is the only way to do so. Therefore, we interpret *Kodak* as standing for two propositions: (1) that firms operating in a competitive primary market are not thereby categorically insulated from antitrust liability for their conduct in related aftermarkets; and (2) that exploitation of locked-in customers is one theory that courts will recognize to justify such liability. *Kodak* identified factors to evaluate alleged anticompetitive aftermarket behavior, and it is possible that those factors may support a theory of antitrust liability that is not necessarily predicated on lock-in exploitation. But any such alternative theory must satisfy the more general rule that an antitrust theory needs to "make[] ... economic sense" and be supported by the evidence. *Matsushita*, 475 U.S. at 587.

Having laid out the applicable principles of law for *Kodak*-style tying and monopolization claims, we turn to their

application in the two surviving antitrust counterclaims in this case.[49]

## 2. PBX Attempted Monopolization Claim

Avaya argues that we should reverse the PBX attempted monopolization judgment on two grounds. First, it says that, once it introduced contract language in 2008 that made clear to customers that they would not be able to use ISPs, no *Kodak* claim could lie as a matter of law. Second, it asserts that, as a matter of law, TLI's evidence of predatory conduct is insufficient to support a § 2 attempted monopolization claim. We agree that Avaya cannot be liable for PBX systems sold after the 2008 contracts were introduced, but we cannot conclude that there was insufficient evidence to support a verdict of liability for the pre-2008 period.

---

[49] As a reminder, those surviving antitrust counterclaims are for attempted monopolization in the PBX maintenance services market, in violation of § 2 of the Sherman Act; and tying PDS software patches to maintenance services, in violation of §1 of the Sherman Act. Given the arguments before us, ours is not to reason why the jury found those particular counterclaims compelling while rejecting the rest.

"We exercise plenary review" over a district court's decision on whether to grant judgment as a matter of law against a jury verdict, but we "must not weigh evidence, engage in credibility determinations, or substitute [our] version of the facts for the jury's." *Pitts v. Delaware*, 646 F.3d 151, 155 (3d Cir. 2011).

### a. Post-2008 Sales Contracts

According to Avaya, by May 2008, all purchasers of new PBX systems were on notice that they were contractually barred from using ISPs, so that there could be no antitrust aftermarket for maintenance. It points out that the sales agreement that accompanied PBX systems at that point expressly provided for "[l]icense [r]estrictions" that made it clear to purchasers – sophisticated and unsophisticated alike – that they could not use ISPs for maintenance. (J.A. 7283.) Specifically, § 6.2 of the sales agreement provided that the

> Customer agrees not to ... allow any service provider or other third party, with the exception of Avaya's ... resellers and their designated employees ... to use or execute any software commands that cause the software to perform functions that facilitate the maintenance or repair of any Product except ... those software commands that ... would operate if ... [MSPs] were not enabled or activated[.]

(*Id*.) Even TLI's CEO, Douglas Graham, testified that when Avaya introduced that version of the sales contract for its new PBX systems, it was "making it clear that ... part of buying [a PBX] is the customer giving up the ability to access an [ISP]." (J.A. 2746.)

In its post-trial opinion granting TLI's request for an injunction, the District Court endorsed that view, even quoting Graham's language. Accordingly, it limited the

97

injunction against Avaya's restraints on ISPs to cover only those PBX systems purchased prior to May 2008.[50]

We agree that no antitrust liability for a *Kodak*-style attempted monopolization claim could lie after May 2008 when customers were put on clear notice that purchasing an Avaya PBX precluded use of ISP maintenance. As we explained in *Queen City Pizza*, when the defendant's power "stems not from the market, but from plaintiffs' contractual agreement," then "no claim will lie." 124 F.3d at 443. By May 2008, PBX customers were on clear notice that Avaya "retained significant power over their ability to purchase cheaper [maintenance] from alternative sources because that authority was spelled out in detail in section [6.2] of the standard [customer] agreement." *Id.* at 440. If the customers viewed those terms as "overly burdensome ... at the time they were proposed, [they] could have purchased a different [brand] of [PBX]." *Id.* at 441. Avaya was therefore "subjected to competition at the pre-contract stage" in the primary market, *id.* at 440, which was undeniably competitive. Absent a new and compelling economic theory to justify antitrust liability that reaches beyond *Kodak* –

---

[50] TLI seeks to downplay the effect of the post-2008 customer agreements by arguing that they were "boilerplate" and "ambiguous" (Answering Br. at 36), and by arguing that there was "*no* evidence that any post-May 2008 Avaya PBX purchasers signed the form contracts" (*id.* at 38). We conclude that there is no reason to disturb the District Court's factual findings or legal conclusion on this point. The contractual language is unambiguous, and TLI's own CEO acknowledged the language's clarity and its use beginning with the new PBX systems introduced in 2008.

which TLI has not provided – Avaya cannot be liable under the antitrust laws for enforcing a transparent contract freely agreed to in a competitive market.

"The purpose of the [Sherman] Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993). For PBX systems sold after May 2008, TLI could not credibly claim that Avaya was abusing its market power over locked-in customers. Instead, TLI's complaint was with its potential customers, who had agreed to Avaya's terms forbidding ISP maintenance in a competitive market. TLI may wish that the PBX customers had demanded access to ISPs when negotiating with Avaya, but that is not a complaint cognizable under the antitrust laws. Therefore, any PBX systems sold during and after May 2008 cannot be a basis for holding Avaya liable for attempted monopolization.

### b.    Sufficiency of Evidence of Predatory Conduct

The Supreme Court has established that

[t]he offense of monopoly under § 2 of the Sherman Act has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.

*Grinnell*, 384 U.S. at 570-71. The purpose of that two-element test for monopolization is to avoid imposing liability when a firm has come to possess a dominant market position in procompetitive fashion by simply out-competing its rivals with a superior product or service. Therefore, even a firm with dominant market share will be liable only when its actions are predatory or anticompetitive in nature. More specifically, a § 2 claim will lie only when "(1) ... the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports*, 506 U.S. at 456. Phrased another way, the would-be monopolist must make "use of monopoly power 'to foreclose competition, to gain a competitive advantage, or to destroy a competitor.'" *Kodak*, 504 U.S. at 482-83 (quoting *Griffith*, 334 U.S. at 107).

Avaya argues that, as a matter of law, there was insufficient evidence of predatory conduct to sustain the conclusion that the second element of a § 2 claim had been proven. According to Avaya, the allegedly predatory acts – *e.g.*, terminating dealings with TLI; sending "fear, doubt, and uncertainty" letters to TLI's maintenance customers; and trespassing and spying on TLI's customers – cannot support a verdict of antitrust liability. We find some merit to Avaya's arguments that those individual acts may be justifiable and not anticompetitive, but we need not resolve this particular argument because it misses the forest for the trees.

It is true that, in a traditional § 2 claim, a plaintiff would have to point to specific, egregious conduct that evinced a predatory motivation and a specific intent to monopolize. *See Spectrum Sports*, 506 U.S. at 456. But in

100

the context of a *Kodak* claim, any proof that the primary market and the aftermarket are separate for antitrust purposes will necessarily include substantial evidence of predatory conduct. The basis of a prototypical *Kodak* claim is that through some combination of price discrimination and post-sale surprise in the aftermarket, the defendant has managed to dissociate a competitive primary market from an aftermarket that the defendant dominates. In *Kodak*, that domination was through control over proprietary parts; here, it is alleged to exist through control of proprietary software. If a *Kodak* defendant has managed to create a relevant antitrust aftermarket, then, it has necessarily acted to "foreclose competition," *Griffith*, 334 U.S. at 107, or to achieve the "willful acquisition ... of monopoly power," *Kodak*, 504 U.S. at 483. In this case, there is no question that Avaya dominates the market for maintenance services on its system, or that control over the maintenance market was the express intent of its efforts to exclude ISPs. Its every action giving rise to this litigation evinces an intent to dominate the maintenance market. The central antitrust question, then, is whether that market is dissociated from the primary PBX market in a way that makes such domination anticompetitive.

Without itself resolving whether a *Kodak* claim will necessarily include significant evidence of predation, the Supreme Court's analysis in *Kodak* suggested that our approach is the right one. In considering the predation prong of § 2 claims, the Court in *Kodak* merely incorporated its prior analysis of market separation to conclude that the plaintiffs had "presented evidence that Kodak took exclusionary action to maintain its parts monopoly and used its control over parts to strengthen its monopoly share of the Kodak service market." *Id*. If we substitute "Avaya" for

101

"Kodak" and "ODMCs/MSPs" for "parts," we can write the same sentence in this case. Rather than requiring some proof of additional predatory conduct in the maintenance market, that portion of the *Kodak* opinion focused instead on Kodak's affirmative defense that "'valid business reasons' [could] explain [its] actions." *Id.* (quoting *Aspen Skiing*, 472 U.S. at 605).

We apply the same analysis here. The evidence that convinced the jury that Avaya has dissociated the primary market from the aftermarket is sufficient to show exclusionary conduct for purposes of § 2. For that reason, we reject Avaya's request for judgment as a matter of law because it asks for proof of additional predatory conduct that is unnecessary in a case like this.[51]

### 3. PDS Tying Claim

Avaya also asks us to reverse the judgment against it for unlawfully tying PDS patches to maintenance, arguing that there was insufficient evidence to support any finding that there was a distinct aftermarket for patches. Before

---

[51] Our reading of *Kodak* further bolsters our conclusion that the District Court's judgment as a matter of law on Avaya's common law claims necessarily prejudiced the antitrust verdict. Protecting itself from tortious forms of competition may well have been a valid business reason to engage in defensive exclusionary conduct, and that kind of affirmative defense was the crux of the *Kodak* opinion's § 2 analysis. That Avaya was not able to make such an argument to the jury improperly hindered its defense against TLI's § 2 claims.

October 2007, Avaya argues, it "made patches freely available to all Avaya PDS owners without requiring them to purchase Avaya maintenance." (Opening Br. at 75.) The patches were available on Avaya's website for any PDS owner to access, irrespective of who provided system maintenance. At trial, TLI's CEO agreed with that, and a representative of SunTrust – the one customer that TLI put on as evidence for its PDS tying claim – testified that TLI was able to provide patches during the entire period that SunTrust hired TLI for maintenance. For PDS hardware sold from October 2007 onward, Avaya did restrict access to its PDS patches to users of Avaya's own support services, but the requirement to purchase Avaya support with the PDS hardware was made clear at the time of sale. Indeed, the SunTrust representative testified that when the firm purchased a new Avaya PDS after October 2007, it was informed that it would be required to purchase Avaya support and, if it wished to receive patches, could not use an ISP.

TLI does not challenge those basic facts, but it argues that the PDS verdict can nonetheless stand. As to the pre-2007 period, it argues that "Avaya used the *threat* of withholding patches to coerce PDS owners into purchasing maintenance from Avaya" (Answering Br. at 64), so that, even though the patches were formally available for free, Avaya still effected a tie. TLI points, as an example, to a letter sent in 2005 to PDS customers telling them that they risked losing access to a host of services, including patches, if they "ch[o]se to engage an Unauthorized Service Provider for services," and threatening that "Avaya will take all necessary legal action against violators in order to protect Avaya proprietary intellectual property." (J.A. 6945.) As to the post-2007 period, TLI argues that "Avaya PDS owners were

not made aware of ... Avaya's policies." (Answering Br. at 67.) Moreover, even if the policy was transparent, TLI argues that there was nonetheless sufficient evidence that the "patches aftermarket ... was not disciplined by the primary PDS market." (*Id.* at 66.)

The 2005 letter to PDS customers, like the PBX FUD letters, was no doubt a frustration to TLI in its own efforts to build its business. Avaya was indeed intent on dominating its own intra-brand market. But that does not mean that Avaya fell afoul of the antitrust laws, which "were enacted for 'the protection of competition not competitors.'" *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962)). It is undisputed that Avaya's patches were freely available to customers on its website without any strings attached before 2007, and the only witness put forward by TLI to prove the efficaciousness of Avaya's threats acknowledged that his firm was freely able to receive patches through TLI. "[W]here the buyer is free to take either product by itself there is no tying problem even though the seller may also offer the two items as a unit at a single price." *Northern Pacific*, 356 U.S. at 6 n.4. Given that Avaya offered the patches freely to PDS customers, TLI needed to put forward compelling evidence that Avaya was somehow nevertheless effecting a *de facto* tie between patches and maintenance. Were TLI to prevail on vague allegations that a strongly-worded letter was as effective as a technological or contractual tie, that would dramatically expand the reach of tying liability. The *Kodak* standard demands more, and we accordingly agree that the evidence before the jury was insufficient as a matter of law to sustain a tying claim

pertaining to PDS systems sold before October 2007, while patches were still freely available.

As for PDS systems sold after Avaya's October 2007 policy went into effect, TLI's tying claim runs into the same problems as did its claim for antitrust injury in the post-2008 PBX market – Avaya introduced clear contractual language in the primary market prohibiting ISP use. If new PDS customers considered the requirements to purchase Avaya software support and to refrain from using ISPs "overly burdensome ... at the time they were proposed, [the buyers] could have purchased a different [brand] of [PDS]." *Queen City Pizza*, 124 F.3d at 441. Where the primary market is indisputably competitive – and there is no dispute here that it was and is – a plaintiff must show special circumstances, such as *Kodak*-style lock-in, to overcome the inference that such competition will discipline any related intra-brand aftermarkets. Given that post-2007 PDS customers were required to purchase an Avaya service plan with their PDS, the link of PDS and maintenance service was fully transparent in the primary market. That undermines any argument for *Kodak*-style lock-in or aftermarket surprise that TLI could make. Having no alternative theory, its PDS tying claim also fails as a matter of law for the post-October 2007 period.

We therefore reverse the jury's entire PDS tying verdict and remand with instructions for the District Court to enter judgment for Avaya on that claim. Given that result, we pause briefly to note that our reversal of the PDS verdict would endanger the validity of the damages award, even if we were not otherwise vacating it because of the District Court's errors regarding the common law claims. "Where a jury has returned a general verdict and one theory of liability is not

105

sustained by the evidence or legally sound, the verdict cannot stand because the court cannot determine whether the jury based its verdict on an improper ground." *Wilburn v. Maritrans GP Inc.*, 139 F.3d 350, 361 (3d Cir. 1998) (citations omitted); *see also Avins v. White*, 627 F.2d 637, 646 (3d Cir. 1980) (Where "[i]t is ... impossible to determine if the jury based its verdict on all" the allegedly unlawful acts "or ... on only one," then "there is the distinct possibility that if we affirm the jury's verdict, we may do so on the basis of" lawful acts.); *Albergo v. Reading Co.*, 372 F.2d 83, 86 (3d Cir. 1966) ("Where, as here, a general verdict may rest on either of two claims – one supported by the evidence and the other not – a judgment thereon must be reversed.").

In this case, the verdict form merely asked the jury to name "the total amount of damages, if any, that ... TLI[] has proven ... were caused by Avaya's violation(s) of the antitrust laws." (J.A. 640.) There is therefore no way to discern which portion of the damages the jury attributed to the PDS tying claim, and which to the PBX attempted monopolization claim. It is true that the PBX market is substantially larger, but if we affirmed the damages verdict on the basis of the pre-2008 PBX claim alone, we would nonetheless risk the "distinct possibility that ... we may do so on the basis of" damages attributable to a liability theory that is invalid. *Avins*, 627 F.3d at 646. Moreover, the jury lacked a cogent way to disaggregate the PBX and PDS damages in the first place because TLI's expert offered testimony based on combined damages.[52] We therefore have no way to know

---

[52] Moreover, the damages expert's two models projected damages of between $133 million and $147 million, a far cry from the jury's finding of $20 million in damages.

106

what portion of the damages verdict is attributable to the invalid PDS tying liability theory, which independently requires vacatur of the damages award.[53]

---

In trying to figure out what portion of that award was attributable to which systems, we would have a hard time reasoning how the jury came to its number in the first place, much less how much is attributable to a liability theory that survives this appeal.

[53] The parties also fight over the jury instructions, but those are arguments we need not resolve because we are vacating the verdict on other grounds. Some comment is nevertheless in order. Avaya complains that the District Court simply gave the jury a list of factors to consider in an "uncabined" manner to determine whether the primary market was dissociated from the maintenance aftermarket. (Opening Br. at 52.) Although there is some merit to that complaint, there is also much to applaud in the District Court's efforts to distill and describe this complex area of law for the jury. In particular, we appreciate that the Court properly identified from *Kodak* and our precedents relevant factors for the jury's consideration.

We agree, however, that – if there is a retrial – the Court should consider describing to the jury a logical path for it to follow in evaluating whether the primary market is dissociated from the aftermarket. For example, with respect to the PBX attempted monopolization claim, a theory of dissociation by aftermarket surprise in this case might run as follows:

1. If you find that customers could not have predicted that Avaya would condition their use of MSPs and ODMCs on customers' refusal to use ISPs, you may

107

conclude that Avaya enacted a surprise aftermarket policy change.

2. If you determine that Avaya enacted such an aftermarket policy change, you must then evaluate whether Avaya had the ability to exercise market power in the aftermarket. To reach such a conclusion, you must conclude that Avaya and its Business Partners were able to exclude competitors in the aftermarket, and that switching costs in the primary market locked in customers.

3. If you determine that Avaya enacted a surprise aftermarket policy change and that it had market power in the aftermarket, you may then decide whether it was possible for Avaya to use that market power to exploit customers. To find the possibility of exploitation, you must conclude that Avaya had the ability to charge supracompetitive prices in the aftermarket.

4. If, and only if, you reach all three of the prior conclusions, may you find that the PBX maintenance market was a relevant antitrust aftermarket.

The foregoing example is not meant as a directive that the District Court must follow, but rather as one proposed approach to "channel" – as Avaya puts it – the jury's consideration of the factors identified in *Kodak*. (Opening Br. at 53.)

Avaya also appealed the District Court's decision to grant TLI prejudgment interest on the basis of what it determined to be Avaya's vexatious litigation strategy. Because we vacate the verdict and the corresponding damages award, the issue of prejudgment interest is moot, and

108

## IV. TLI's Cross-Appeals

Having resolved Avaya's appeals, we turn now to TLI's cross-appeals. It challenges the District Court's grant of summary judgment against two of its tort counterclaims and against one of its antitrust counterclaims. It also challenges the District Court's decision under the *Noerr-Pennington* doctrine that TLI could not use Avaya's litigation conduct as evidence of anticompetitive behavior. All of those rulings are sound, and TLI's arguments are not.[54]

### A. Summary Judgment on TLI's Common Law Claims

We begin with the District Court's grant of summary judgment against TLI's counterclaims for trade libel and for tortious interference with prospective economic advantage. Both claims were based on the so-called FUD letters that Avaya sent to existing and prospective TLI customers. The tortious interference claim was also based on Avaya's

---

we decline to address it. The question may be considered afresh, if necessary, following retrial.

[54] Our review of a district court's grant of summary judgment is plenary. *Boyle v. Cty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998). "[S]ummary judgment may be granted if the movant shows that there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party. All facts and inferences are construed in the light most favorable to the non[]moving party." *Id.* (internal citation and quotation marks omitted).

deactivation of TLI customers' MSPs. The District Court granted summary judgment against TLI on those claims on the ground that TLI did not present sufficient evidence to create a dispute of material fact over whether Avaya's conduct actually caused TLI any loss in business.[55]

---

[55] The parties dispute whether the District Court applied the correct legal standards for the tort claims. For tortious interference, "New Jersey law requires that a plaintiff ... present proof that *but for* the acts of the defendant, the plaintiff would have received the anticipated economic benefits." *Lightning Lube*, 4 F.3d at 1168 (internal quotation marks omitted). TLI disputes whether the District Court actually applied that "but for" test, suggesting that it improperly demanded that TLI prove that Avaya's actions were the *sole* cause of injury. Despite some potentially confusing language, the District Court's opinion did apply the "but for" test as explicated in *Lightning Lube*. TLI also argues that the District Court should have instead applied a test evaluating whether Avaya's conduct was a "substantial factor" in causing TLI's injury. *See Verdicchio v. Ricca*, 843 A.2d 1042, 1056 (N.J. 2004) (applying the "substantial factor" test in a medical malpractice case). Because a "substantial factor" causation test would not have altered the result, we need not consider whether it was more appropriate.

With regard to the legal standard for trade libel, both parties agree that TLI had to prove special damages. TLI wanted the Court to apply a "material and substantial part" test for causation of those damage, *see Patel v. Soriano*, 848 A.2d 803, 835 (N.J. Super. Ct. App. Div. 2004), whereas Avaya supports the "natural and direct result" standard that the District Court did apply, *see Mayflower Transit, LLC v. Prince*, 314 F. Supp. 2d 362, 378 (D.N.J. 2004). Again, we

110

The District Court provided a detailed explanation of the deficiency of the evidence before it. As to the MSP deactivations, the Court observed that MSP access was not required to provide maintenance, citing TLI's own interrogatory responses about alternative methods that it in fact used to provide service to customers. As the Court explained, TLI "used ... default passwords or hired a third party to determine active passwords," so that "whether MSPs were activated had little bearing on whether [TLI] could provide maintenance to customers." (J.A. 105.)[56] Those alternative methods were sufficiently successful, in fact, that they led Avaya to bring suit against TLI, alleging that they were unlawful and resulted in the loss to Avaya of significant business.

As to the FUD letters, the District Court decided that TLI had not "come forth with sufficient evidence that the Avaya letters were the *de facto* cause of the loss of current and prospective maintenance contracts." (J.A. 105.) TLI's examples of lost contracts were not at all persuasive. For instance, TLI suggested that the State of Michigan was one such lost contract, but an employee of that state testified that there were "numerous reasons" not to use TLI – unrelated to

need not resolve which standard is correct because the outcome is the same under either.

[56] At trial, Scott Graham validated the District Court's conclusion when he testified that he was "[n]ot ... aware of" a case in which TLI was not able to get "into the maintenance software" of a prospective customer. (J.A. 2443.) In fact, it is "[c]orrect" that TLI was "always successful." (*Id.*)

Avaya, and some directly caused by TLI – and that she was not under any "impression that Avaya would sue the State of Michigan if it awarded the contract to [TLI]." (J.A. 106.)[57] The only specific example TLI provided of a customer who declined its services because of a FUD letter was substantiated only by an email – inadmissible as hearsay – sent *by a TLI employee* complaining about the lost contract. Finally, the Court refused to draw any inferences from the report of TLI's damages expert on the grounds that it was "not supported ... by affidavits or any other evidence that would be admissible at trial." (J.A. 108.)

In this appeal, TLI relies principally upon that expert report and contests the District Court's characterization of it, arguing vaguely that the report was based on "business records [and] excerpts from depositions of customers and TLI[] employees." (Answering Br. at 93.) In support of that contention, TLI cites the expert's certification, in which he declared that he "relied upon facts, data and work typically relied upon by experts in the economic/accounting industry." (Suppl. App. 10.) TLI also cites 93 pages of inscrutable spreadsheets in which the expert – without explanation – assigned various damages to contracts that TLI allegedly lost due to Avaya's conduct.

---

[57] Other examples provided by TLI were similarly unimpressive. For instance, TLI relied on a cease and desist letter that *it* sent to Avaya in 2010. The District Court concluded that the mere existence of such a letter "is no more helpful to the Court on summary judgment than ... pleadings," without additional "evidence sufficient to prove that the allegations made in the ... letter are in fact true." (J.A. 107.)

112

The District Court's rejection of TLI's argument was thoroughly justified. The evidence TLI offered in opposing summary judgment consisted of naked accusations that Avaya's conduct cost it business. That the allegations were recited by an expert witness or by TLI employees does not bolster them.[58] *See Advo, Inc. v. Phila. Newspapers, Inc.*, 51 F.3d 1191, 1198 (3d Cir. 1995) ("[E]xpert testimony without ... a factual foundation cannot defeat a motion for summary judgment."). Even now on appeal, after a decade of litigation, TLI cannot point to one specific example where it has credible evidence that Avaya's allegedly tortious conduct harmed its business. We therefore agree with the District Court that TLI failed to present sufficient evidence to create a material dispute of fact about whether Avaya's MSP deactivations or FUD letters caused injury to TLI. Summary judgment was appropriate on both the tortious interference and the trade libel claims.

## B. Summary Judgment on PBX Upgrade Tying Claim

The jury rejected TLI's § 1 tying claim for the PBX market and found that there was no relevant antitrust aftermarket for PBX patches, but TLI nonetheless asks us to revive a separate § 1 tying claim. It appeals the District

---

[58] The expert's credibility is further undermined by the fact that at a subsequent *Daubert* hearing, the District Court determined that he was "'[c]learly ... not competent' to testify about an individual customer's motivations." (Third Step Br. at 62 (alteration and omission in original) (quoting J.A. 4071).)

113

Court's grant of summary judgment against its claim that Avaya unlawfully tied PBX upgrades and maintenance.

Before addressing the reasoning of the District Court, we note that, in light of our already-set-forth explanation of *Kodak*-style tying claims, we are skeptical of the tying claim regarding PBX upgrades, especially given the jury's rejection of the tying claim related to PBX software patches. Upgrading a PBX system requires a customer to step back into the competitive primary PBX market, thereby at least partially ameliorating any lock-in concern and making it less likely that Avaya could dissociate the primary market from an aftermarket. We acknowledge that in the PBX upgrade market there may still be some reliance on past investments in an old Avaya system, but if the jury rejected the notion that PBX patches satisfied the *Kodak* theory – when patches are strictly aftermarket products – we doubt that it would have been more sympathetic to an argument that upgrades were unlawfully used as a tie.

Antitrust theory aside, the District Court granted summary judgment for the simple reason that TLI had failed to present any substantial evidence that Avaya's alleged threats to withhold upgrades had actually affected "a substantial amount of interstate commerce," as required to make out a § 1 claim. (J.A. 165.) It characterized TLI's proffered evidence as consisting of "little more than assertions," which the "Court [found] insufficient." (*Id.*) That evidence – which TLI presses upon us anew on appeal – again consists of expert reports arguing that Avaya used upgrades as part of a scheme to foreclose competition in the maintenance market. Avaya defends the District Court by

114

arguing that that "evidence" was merely unsupported assertions filtered through TLI's experts.

Reviewing the record ourselves, and drawing all reasonable inferences in favor of TLI, we find ourselves in agreement with Avaya and the District Court. In opposing summary judgment, TLI presented no evidence to raise an issue of material fact about whether Avaya was able to harm TLI by using PBX upgrades to restrain competition in the maintenance market. We will therefore also affirm that aspect of the District Court's summary judgment order.[59]

### C.  *Noerr-Pennington* **Ruling**

The final issue we consider is TLI's cross-appeal of the District Court's ruling, under the *Noerr-Pennington* doctrine, that TLI could not present evidence at trial of Avaya's litigation conduct as a basis for the accusation of monopolistic conduct. "Under the *Noerr-Pennington* doctrine – established by *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961), and *United Mine Workers v. Pennington*, 381 U.S. 657 (1965) – defendants are immune from antitrust liability for engaging in conduct (including litigation) aimed at influencing

---

[59] We note, however, that insofar as TLI may have later developed more evidence on the use of upgrades to tie, that evidence remains relevant to TLI's attempted monopolization claim. There is nothing to prevent TLI from presenting the upgrade tying theory to the jury as part of its surviving § 2 claim on remand, but that does not ameliorate the fact that its evidence at the summary judgment stage was so scant.

decisionmaking by the government." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1757 (2014) (citation omitted). In *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49 (1993), the Supreme Court explained that "sham" litigation – unlike ordinary litigation – is not off limits as a source of antitrust liability. The Court gave a two-part test for identifying a lawsuit as a sham: "First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. ... [S]econd[,] ... the baseless lawsuit conceals 'an attempt to interfere directly with the business relationships of a competitor,'" *id.* at 60-61 (emphasis removed) (quoting *Noerr*, 365 U.S. at 144), "through the 'use of the governmental process – as opposed to the outcome of that process – as an anticompetitive weapon,'" *id.* at 61 (alteration and emphases removed) (quoting *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 380 (1991)).

TLI challenges the District Court's contention that "the whole case has to be a sham" for the sham exception to apply. (Suppl. App. 190.) Instead, TLI argues, the sham exception should be applied on a claim-by-claim basis. Avaya responds by citing the language in *Professional Real Estate* that refers to a "lawsuit" rather than a claim, and which references the "governmental process" rather than any specific action in a suit. It also argues that, as a policy matter, adopting a claim-by-claim "approach would introduce extraordinary complexity into jury deliberations" by forcing juries to not only decide the merits of each claim but also decide which are objectively reasonable or not. (Third Step Br. at 66.) As the District Court noted when ruling on the issue, cases often involve claims of varying degrees of merit, many of which

116

are weeded out pre-trial, and it would be impractical to run a litigation system that made those kinds of claims subject to antitrust suits.

We agree with that conclusion. True, one might imagine a situation where a single claim, separated from an otherwise arguably meritorious suit, is so harmful and costly to a defendant that it might impose anticompetitive harm on the defendant in a way that triggers the sham litigation exception to *Noerr-Pennington*. But the Supreme Court's elaboration of the "sham" exception suggests that we should not go hunting for that example, and this case is not it. Some of Avaya's claims that were dismissed before trial may have been weak, but they were part and parcel of a course of litigation that proceeded to two months of substantial evidence and argument to a jury. We do not consider Avaya's affirmative claims to be frivolous or unsubstantiated; in fact, we are vacating the Rule 50 judgment that was entered against them. TLI may consider Avaya's litigation conduct vexatious – as the District Court did in awarding prejudgment interest – but its suit against TLI was not a "sham."[60] We therefore affirm the District Court's ruling that Avaya's litigation conduct was protected from antitrust liability by the *Noerr-Pennington* doctrine.

---

[60] Which is not to say that we endorse the District Court's determination that the award of prejudgment interest was appropriate in this case. Again, Avaya's present challenge to that award has been mooted by our disposition with respect to the other claims presented.

**V.     Conclusion**

For the foregoing reasons, we will vacate the judgment of the District Court and remand for further proceedings consistent with this opinion.   We will also reverse the judgment of liability on the entire PDS tying claim and on the PBX attempted monopolization claim as to the post-2008 time period and will remand with instructions to enter judgment as a matter of law for Avaya on those claims.  We will affirm the orders of the District Court as to all issues raised by TLI's cross-appeal.

*Avaya, Inc. v. Telecom Labs, Inc.; TeamTLI.com Corp.; Continuant, Inc.; Scott Graham; Douglas Graham; Bruce Shelby*, Nos. 14-4174, 14-4277

HARDIMAN, *Circuit Judge*, concurring in part and dissenting in part.

For litigation that has lasted some fifteen years, this appeal involves remarkably few disputed facts. The trouble began soon after Plaintiff Avaya (the Goliath of this saga) laid off many of its workers because of a downturn in the telecommunications market in 2000. Those layoffs gave rise to independent companies that offered aftermarket maintenance on the Private Branch Exchanges (PBXs) sold by Avaya. In fact, Avaya provided training and subsidies to companies that hired its former employees, and some companies became authorized Avaya dealers or business partners. Defendant TLI (the David of the saga) became one of those official business partners.

TLI obtained its first customer in 2001 and invested millions in its maintenance business. For whatever reason, Avaya reversed course in 2002 and began limiting the ability of its business partners, customers, and independent (unauthorized) providers to perform PBX maintenance. This change in strategy resulted in the creation of the Avaya One contract, which required Avaya business partners to promise not to solicit maintenance business from selected Avaya customers. Some 300 Avaya One contracts were signed and TLI signed its contract on March 21, 2003. Unlike all of Avaya's other business partners, however, TLI negotiated a handwritten modification to its covenant not to compete that expressly authorized TLI to solicit maintenance business from certain Avaya customers. This modification was the spark

1

that ignited the forest fire that continues to rage twelve years later.

When Avaya's Head of Global Sales, Linda Schumacher, learned of the carve-out TLI had negotiated, she was "shocked" and quickly took steps to cancel TLI's contract just four months after it was signed. On July 31, 2003, Avaya gave the required 60 days' notice that it was terminating the contract and spent the months of August and September notifying TLI's customers that it soon would no longer be an Avaya business partner. Claiming antitrust violations, TLI went to federal court seeking an injunction requiring Avaya to allow TLI access to the codes necessary to maintain its customers' machines. The court denied the injunction and TLI dropped the case.

Undeterred, TLI used a variety of methods to access its customers' PBXs in order to perform maintenance. TLI accessed some machines by using passwords and logins it had received previously and it obtained others from the internet. Some of TLI's customers had purchased permissions for the life of their machines, which enabled TLI to provide maintenance by using those logins. Other methods used by TLI were deceitful and/or unethical. For example, some Avaya business partners acted as conduits for TLI by posing as the maintenance provider, only to pass along the credentials to TLI. TLI also employed two former Avaya employees, David Creswick and Harold Hall, who used what they had learned to "hack and crack" the PBXs of TLI's customers to obtain the credentials necessary to service them. In short, even after TLI was terminated as an Avaya business partner, TLI used various methods to provide aftermarket maintenance—a service that purchasers of Avaya's PBXs

2

were expressly authorized by contract to provide for themselves or to hire third parties like TLI to provide.

Avaya sued TLI in federal court in 2006, alleging numerous causes of action under federal and state law. After seven years of scorched-earth litigation, Avaya withdrew six claims just days before the trial began. For almost two months, Avaya put on evidence in support of its seven remaining claims. At the conclusion of Avaya's case-in-chief, TLI moved for judgment as a matter of law under Rule 50 of the Federal Rules of Civil Procedure. The District Court granted TLI's motions, throwing out Avaya's case in its entirety.

My colleagues on the panel, both experienced former trial lawyers and trial judges, conclude that the District Court committed legal error when it granted TLI's Rule 50 motions. Although I had far less experience as a trial lawyer and trial judge than my distinguished colleagues, my visceral reaction to the Court's Rule 50 decision is consistent with theirs. The question looms large: Why, after seven years of discovery and two months of trial, did a jurist with 22 years of experience not allow any of Avaya's claims go to the jury? To ask the question implies the imprudence of the decision, at least on an instinctual level. But visceral reactions aren't always correct, and I must say that after reading the entire transcript of the trial, I agree with Judge Irenas's 52-page opinion explaining his reasons for throwing out Avaya's case. After seven years, Avaya finally withdrew almost all of its federal claims. The seven state-law claims that remained— which involved breach of contract, fraud, and unfair competition—simply were not proven at trial. At the end of the day, my assessment of Avaya's case-in-chief is the same

3

as the District Court's: full of sturm und drang, but insubstantial.

Having expressed my opinion on that score, I confess enough doubt about the propriety of the District Court's decision to grant the Rule 50 motion that the focus of my partial dissent presumes the correctness of my colleagues' opinion on that point. Instead, I take issue with the decision to vacate the judgment TLI earned on two of its counterclaims arising under the antitrust laws. Even assuming, arguendo, that the District Court erred when it granted TLI's Rule 50 motions, I remain convinced that any error had little or no impact on the verdicts in favor of TLI. In my estimation, David struck Goliath right between the eyes and should not be deprived of his hard-earned victory on the counterclaims.

The crux of my partial dissent is that I cannot agree that the District Court's rejection of Avaya's claims "taint[ed] the entire trial and the ultimate verdict." Majority Op. 6. Perhaps I would find greater assurance in the Majority's taint analysis if Avaya had adequately raised it. I have serious doubts that it did. Even still—without the benefit of developed adversarial briefing on the issue—I do not believe the District Court's judgment as a matter of law so impaired Avaya's ability to defend itself against TLI's allegations of anticompetitive conduct that we cannot have confidence in the jury verdict as a whole. For that reason, I would affirm the verdict with respect to Avaya's pre-2008 attempted monopolization of the PBX maintenance aftermarket and I

4

respectfully dissent from the Majority's holding to the contrary.[1]

---

[1] Although I believe the jury was properly instructed as to the factors for finding a relevant antitrust aftermarket for Avaya PBX system maintenance and could have reasonably found Avaya liable for attempted monopolization of that aftermarket prior to its introduction of transparent sales contracts in May 2008, I agree with the Majority that Avaya cannot be held liable for PBX systems sold after that time. I also agree that the jury could not have reasonably found Avaya liable for tying PDS patches to maintenance either before 2007 (the patches were free, so there was no coercion) or after (the conditions were clear upfront, so there was no relevant antitrust aftermarket). Moreover, because the general verdict did not dissociate damages stemming from attempted monopolization of the PBX maintenance aftermarket from those attributable to the alleged PDS tying, I agree that the damages award must be vacated and that we therefore need not reach the issue whether the District Court abused its discretion in granting TLI's motion for prejudgment interest under the Clayton Act. I also join the Majority's rejection of TLI's cross-appeals.

Finally, I commend Judge Jordan for his rigorous synthesis of the *Eastman Kodak Company v. Image Technical Services Inc.* branch of antitrust law, which has bedeviled litigants and courts alike. I agree with his analysis wholeheartedly. Because the District Court's jury instructions comport with the principles outlined by Judge Jordan, I would hold that they were sufficient to "properly apprise[] the jury of the issues and the applicable law." *Smith v. Borough of Wilkinsburg*, 147 F.3d 272, 275 (3d Cir. 1998) (quotation

I

Under both the Federal Rules of Appellate Procedure and our Local Rules, "appellants are required to set forth the issues raised on appeal and to present an argument in support of those issues in their opening brief." *Kost v. Kozakiewicz*, 1 F.3d 176, 182 (3d Cir. 1993). A "passing reference to an issue . . . will not suffice to bring that issue before this court." *Laborers' Int'l Union of N. Am. v. Foster Wheeler Energy Corp.,* 26 F.3d 375, 398 (3d Cir. 1994) (omission in original) (quotation marks omitted) (quoting *Simmons v. City of Philadelphia*, 947 F.2d 1042, 1066 (3d Cir. 1991)). And the argument must include the "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies." F.R.A.P. 28(a)(8)(A); *see also Simmons,* 947 F.2d at 1065 (explaining that "briefs must contain statements of all issues presented for appeal, together with supporting arguments and citations"). Casual assertions supported only by "cursory treatment" do not suffice. *Kost*, 1 F.3d at 182. If a claim of error is "unaccompanied by developed argument," it is forfeited. *Rodriguez v. Municipality of San Juan*, 659 F.3d 168, 175 (1st Cir. 2011); *Kost*, 1 F.3d at 182. [2]

marks omitted) (quoting *Limbach Co. v. Sheet Metal Workers Int'l Ass'n, AFL-CIO*, 949 F.2d 1241, 1259 n.15 (3d Cir. 1991) (en banc)).

[2] "Forfeiture" and "waiver" are often treated as interchangeable terms. As I have explained elsewhere, they are not. *See Tri-M Grp., LLC v. Sharp*, 638 F.3d 406, 432 n.1 (3d Cir. 2011) (Hardiman, J., concurring) ("Whereas forfeiture is the failure to make the timely assertion of a right,

6

This requirement is not a mere formality. As my esteemed colleague recently wrote: "[t]here is good reason for this [rule]. Brief, casual references to arguments do not put the opposing party on adequate notice of the issue, nor do they develop it sufficiently to aid our review." *NLRB v. FedEx Freight, Inc.*, 2016 WL 4191498, at \*11 (3d Cir. Aug. 9, 2016) (Jordan, J., concurring).[3] Indeed, this "is particularly true 'where important and complex issues of law are presented, [making] a far more detailed exposition of [an] argument'" necessary to avoid forfeiting it. *Id.* (second alteration in original) (quoting *Frank v. Colt Indus., Inc.*, 910 F.2d 90, 100 (3d Cir. 1990)). This appeal presents just such a situation.

Avaya's opening brief mentioned the taint issue only in passing. The matter received no mention in Avaya's issues section of the brief, which I find significant because the question of whether the District Court erred in granting judgment as a matter of law against Avaya's common law claims is an issue distinct from whether such error tainted the verdict on TLI's *antitrust claims*—something the structure of the Majority opinion rightly makes clear. *See United States v. Joseph*, 730 F.3d 336, 341–42 (3d Cir. 2013) (distinguishing between "issues" and "arguments"). Then, on the three occasions Avaya did mention tainting in its brief, its

waiver is the intentional relinquishment or abandonment of a known right.") (quoting *United States v. Olano,* 507 U.S. 725, 733 (1993) (internal quotation marks omitted)).

[3] *See also Rodriguez,* 659 F.3d at 175 ("Judges are not mind-readers, so parties must spell out their issues clearly, highlighting the relevant facts and analyzing on-point authority.").

argumentation was skeletal at best.[4] This was not lost on TLI, which—in Avaya's words—"crie[d] waiver" in its response brief. Avaya Reply Br. 18 n.4 (citing TLI Br. 87). Rightly so. As TLI put it, Avaya failed to "advance [its] conclusory

---

[4] Two of these instances were little more than *ipse dixits*. *See* Avaya Br. 4 ("The erroneous dismissal of Avaya's claims and the court's instruction that TLI['s] conduct was not unlawful also tainted the jury's consideration of TLI['s] antitrust counterclaims."); *id.* at 72 ("In any event, the erroneous instructions that tainted the jury's consideration of TLI['s] "FUD" allegations require a new trial."). Neither of these assertions was supported by any reasoning or citation to legal authority or record evidence. The third mention of tainting offered a few sentences of additional bluster— accusing the trial judge of "discredit[ing] Avaya in the jury's eyes" and "crippl[ing] Avaya's ability to respond to TLI['s] antitrust claims by showing that it had legitimate and procompetitive business reasons" for its actions—but was purely skeletal. *Id.* at 43 (introductory paragraph to antitrust argument section). Avaya again offered no development of its theory or citation to case law or the trial record. Passing references like these should be deemed forfeited. *See Bryant v. Gates*, 532 F.3d 888, 898 (D.C. Cir. 2008) (holding that a claim was forfeited where it was made only in a "conclusory" manner because "[i]t is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work" (quoting *N.Y. Rehab. Care Mgmt., LLC v. NLRB*, 506 F.3d 1070, 1076 (D.C. Cir. 2007))); *Donahue v. City of Boston*, 304 F.3d 110, 122 (1st Cir. 2002) (determining that an argument was forfeited where the "main brief devote[d] only three sentences to the issue" that were "half-hearted" and "poorly developed").

'taint' contention in a freestanding and developed argument." TLI Br. 86. Because Avaya merely floated the taint idea "without squarely arguing it," *FedEx Freight*, 2016 WL 4191498, at \*11 (Jordan, J., concurring), I would deem it forfeited.

The three-point tainting theory on which the Majority bases its decision comes not from Avaya's opening brief but from its reply brief. *See* Avaya Reply Br. 18–19; Majority Op. 67–79. But the black-letter rule is that "[w]e will not revive a forfeited argument simply because" an appellant finally develops "it in its reply brief." *Republic of Argentina v. NML Capital, Ltd.*, 134 S. Ct. 2250, 2255 n.2 (2014); *see also In re Surrick*, 338 F.3d 224, 237 (3d Cir. 2003). This dooms at least two taint-related arguments developed only on reply: (1) that judgment as a matter of law against Avaya's common law claims undermined Avaya's ability to present pro-competitive justifications for its conduct, and (2) the related point that the District Court erroneously limited witness testimony to that effect.

Avaya did not couch its argument regarding the effects of the District Court's instructions about the lawfulness of TLI's access to maintenance commands on the jury's consideration of the "fear, uncertainty, and doubt" (FUD) letters in terms of tainting until its reply brief. It did, however, raise this alleged instructional error in its separate argument that the jury could not have properly found that Avaya engaged in anticompetitive conduct in the PBX maintenance aftermarket. I address this argument below. As for the other grounds on which the Majority deems the antitrust verdict improper, I would hold them forfeited.

II

9

Even had Avaya adequately developed all three prongs of its taint argument, I would not conclude that the District Court's errors constituted reversible error. First, the Majority concludes that the District Court's instructions after its dismissal of Avaya's common law claims undermined the jury's ability to assess the reasonableness of Avaya's actions in light of TLI's allegedly unlawful conduct. It highlights the trial judge's instruction that TLI's "use of and access to [Avaya's] maintenance software may not be considered by you as *unlawful* when deciding TLI['s] claims against Avaya asserted in the counterclaim." App. 4739.

Despite this instruction, Avaya had ample opportunity to present the jury with legitimate and procompetitive defenses for its actions, and those defenses did not depend on whether TLI's conduct was so egregious as to be *against the law*. Indeed, Avaya's persistent refrain to the jury was that the actions Avaya took against TLI were reasonable because TLI was an "*unauthorized*" PBX servicer undermining Avaya's "procompetitive" Business Partners program. App. 4569–71.[5]

---

[5] In its closing argument, after explaining to the jury that it would be instructed that "TLI's use of and access to Avaya's maintenance software may not be considered by you to have been unlawful" Avaya explained that "what remains is a series of decisions by you, as to whether Avaya's conduct was a reasonable competitive reaction to the events Avaya confronted in the marketplace." Trial Transcript ("Tr.") 3/19/14, 15752. It then proceeded to make the case that Avaya's actions were nothing more than "legitimate efforts to protect its software and its business model," *id.* at 15756; that the law "allows for fierce, fierce competition," *id.* at 15757; that Avaya's practices were consistent with industry practices

10

Avaya made a thorough, sustained case for the legitimacy and procompetitiveness of its actions and did not pull any punches in lambasting TLI's conduct. Accordingly, I think it quite unlikely that labeling TLI's conduct "unlawful" on top of all this would have changed the result.

In a similar vein, the Majority finds taint in the constraints the District Court imposed on the evidence Avaya presented at trial. The Majority notes that Avaya "points to two examples in particular" of how the District Court's judgment as a matter of law "hindered its ability to present evidence in its defense against the antitrust claims."[6] Majority Op. 75. The first is the District Court's warning that Avaya could not "tell the jury" that TLI's means of accessing Avaya PBX systems was "illegal" during its cross-examination of TLI's CEO. App. 4440. My colleagues concede that "the Court did allow the line of questions," Majority Op. 75, which was not directed toward criticizing TLI's access practices, but rather, was offered to demonstrate that Avaya's policy toward unauthorized service providers was consistent

and business realities and that the Business Partner program enhanced competition in the marketplace; that its concerns about unauthorized PBX maintenance providers with no relationship to Avaya were legitimate because poor-quality servicing of Avaya PBX's could damage the Avaya brand; and that TLI was the party with questionable practices given its choice to pursue Avaya maintenance customers without authorization rather than "play" by the "rules," *id.* at 15767.

[6] In doing so, it fails to mention that these two examples are drawn exclusively from Avaya's reply brief— the first time Avaya mentioned them in this appeal. *Compare* Majority Op. 75, *with* Avaya Reply Br. 19.

11

with industry practice and did not cause TLI any anticompetitive harm. Second, the Majority is troubled by the trial judge's rather innocuous caveat to Avaya when examining its economics expert to "[s]tay away from trying to, in effect, contradict anything I've already decided." App. 4587. The Court again allowed Avaya's line of questioning, deeming it "fair game" and unrelated to any allegations of illegality. App. 4586. This is unsurprising, given that the expert's testimony was directed toward showing that TLI had in fact *benefited* from Avaya's allegedly anticompetitive conduct because its Business Partners program made TLI the only independent game in town. I am at a loss to see how the ability to call TLI's conduct "illegal" would have meaningfully advantaged Avaya in these lines of inquiry. And even if there were instances in which this characterization would have been of rhetorical benefit to Avaya, it would not have changed the substance of Avaya's procompetitive-justification argument.

Finally, I am not persuaded that the District Court's instruction that it was not "unlawful," App. 615, for TLI to access Avaya's maintenance software tainted the jury's consideration of whether the FUD letters constituted anticompetitive conduct. Among other things, these letters told Avaya customers that accessing PBX and PDS systems through unauthorized service providers "is a violation of federal and state laws and could result in civil and criminal liability and penalties" and that Avaya would "take all necessary legal action against violators." App. 6945; *see also* App. 3904–05, 3940, 4057–58, 7307. And with respect to these letters, the Court instructed the jury that "the law does not allow [TLI's] injury to be based on . . . Avaya's dissemination of truthful statements." App. 621.

12

Even if the jury had not been instructed that unauthorized access to Avaya software was not illegal, it is unlikely that it would have reached a different verdict. Avaya's own witnesses admitted that they had no idea whether there was any legal basis for the letters Avaya sent to its PBX customers stating that unauthorized use of maintenance service permissions and logins "violat[es] . . . federal and state laws" and "could result in civil and criminal penalties." And they conceded that Avaya did not actually plan to sue its customers. App. 3904–05, 3940, 4057–58. Even if some of the threats Avaya issued in its FUD letters might have been rooted in truth (the fact that use of an unauthorized service provider could result in the loss of certain services only provided by Avaya and its Business Partners certainly was), the jury's inescapable conclusion was that at least some of these threats were not true. Indeed, in defending the letters, Avaya focused on the obvious truths (Avaya-exclusive benefits, TLI's unauthorized status, etc.) yet conceded "the fact that a private party can't possibly pursue criminal liability," which is "for the public authorities." Tr. 15871. Avaya characterized this misstatement of law as "unfortunate language," *id.*; the jury surely recognized this as a euphemism for "not true." Simply put, it was obvious to any fair-minded reader that the FUD letters were over-the-top, at least partially baseless, and threats that couldn't fairly be described as "legal opinion." Avaya Br. 66. I do not perceive a high probability that the jury would have found them kosher had it known that a customer's hiring an unauthorized service provider might amount to a breach of contract. After all, it was instructed that even if "a truthful statement is coupled or limited with an

13

untruthful statement, the truthful statement loses its protection and can underlie an injury." App. 621.[7]

---

[7] Avaya's primary attack on the FUD issue is that the jury instructions misstated the law by failing to inform the jury of "a presumption" assigning *de minimis* competitive effect to false statements that antitrust plaintiffs "must overcome" by meeting a six-factor test if they are to show a FUD practice to be anticompetitive. Avaya Br. 64 (citing *American Prof'l Testing Serv. v. Harcourt Brace Jovanovich Legal & Prof'l Publ'ns*, 108 F.3d 1147, 1152 (9th Cir. 1997)). Because our Court is not among those that have adopted this presumption and six requirements, s*ee, e.g.*, Maurice E. Stucke, *How Do (and Should) Competition Authorities Treat A Dominant Firm's Deception?*, 63 SMU L. Rev. 1069, 1086 (2010), I would hold that the instructions were fine. I would also conclude that there was sufficient evidence for the jury to find the FUD letters anticompetitive, especially given that such a finding has stronger foundation "when . . . combined with other anticompetitive acts" by Avaya. *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 109 n.14 (3d Cir. 2010).

To the extent that sufficient evidence also needed to support TLI's other theory of liability (anticompetitive refusal to deal) given that the general verdict form does not indicate which of Avaya's allegedly anticompetitive acts formed the basis for the verdict, I would hold—with some reservation—that it does. The District Court's instructions were consistent with the Supreme Court's precedents setting forth the "limited circumstances in which a firm's unilateral refusal to deal with its rivals can give rise to antitrust liability," *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 448

   \*  \*  \*

  The Majority upends a sound verdict—reached after a decade of litigation and seven months of trial—based on a few snippets mentioned only in passing in Avaya's opening brief. The Majority picks up the dropped ball and runs with it, imbuing Avaya's taint argument with force it never pressed in its opening brief. And even had it done so, I would not hold that any error the District Court may have committed in the second month of the trial was fatal to the whole enterprise. Accordingly, I respectfully dissent from the decision to vacate the judgment in favor of TLI on its counterclaim for Avaya's pre-2008 attempted monopolization of the PBX maintenance aftermarket.

---

(2009), and my review of the record leads me to conclude that TLI provided that "minimum quantum of evidence from which a jury might reasonably afford relief." *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1095 (3d Cir. 1995) (quoting *Rotondo v. Keene Corp.*, 956 F.2d 436, 438 (3d Cir. 1992)).

15